MaddeN, Judge,
delivered the opinion of the court:
This is a suit by the Tee-hit-ton Indians, a “elan” of American Indians in Alaska. They are descendants of the earliest known native inhabitants of • an area of land in southeastern Alaska. They claim that a compensable interest in land belonging to them was taken when the United *85 States, on August 20,1951, agreed'tó sell to a pulp and paper company all merchantable timber on a specified portion of the land. The Government’s agreement was- authorized by two statutes, the most directly pertinent of which is the Joint Eesolution of August 8,1947, 61 Stat. 920. Our jurisdiction is based upon Section 1505 of the Judicial Code, 28 U. S. C. 1505.
The Government filed its answer to the plaintiff’s petition and the plaintiff made a motion that the court enter an order under its Eule 38 (b) limiting the issues, for the time being, to certain issues, the solution of which might make unnecessary the taking of voluminous evidence as to use, occupation, possession and value of large and remote areas in Alaska. The court granted the plaintiff’s motion and specified six issues for trial. The resolution of these issues required the taking of some evidence, which was taken before a commissioner of this court, and consisted largely of public documents and historical and scientific writings. The commissioner has made'a report to the court, finding the facts which he regarded as pertinent to the six questions posed by our order made under Eule 38 (b). The first of the questions is:
1. Is the plaintiff an “identifiable group of American Indians residing within the territorial limits of * * * Alaska” within the meaning of 28 U. S. C. § 1505 ?
We answer this question in the affirmative. There seems to be no difficulty in identifying the Tee-hit-ton as a group of persons. The Government, in urging that we answer this question in the negative, does not deny the identifiability of the Tee-hit-ton as persons, but denies that they, as a group or clan, owned anything. It says that even if they exploited certain lands for the purpose of taking fish or game or berries or roots from them, that was not ownership. We think that an entity, such as an individual, or a tribe or clan of Indians, which exploits land under a claim of right, to the exclusion of others, and takes from the land what is of interest to it, though what interests it might not interest others of a different culture, is asserting “ownership” of that land.
Though the evidence is not. entirely clear as to whether the clan as a whole, or some smaller subdivision of it, such as a village unit or a house unit was the claimant of the property *86 exploited by the Tee-hit-ton, we have concluded that some, at least, of the land exploited by the Tee-hit-ton was claimed by the plaintiff clan as a whole, and that it is, therefore, an identifiable group of Indians within the meaning of the statute.
Our second question is:
2. What property rights, if any, would plaintiff, after defendant’s 1867 acquisition of sovereignty over Alaska, then have had in the area, if any, which from aboriginal times it had through its members, their spouses, in-laws, and permittees used or occupied in their accustomed Indian manner for fishing, hunting, berrying, maintaining permanent or seasonal villages and other structures, or burying the dead ?
The plaintiff tribe would draw a sharp distinction between the nature of the interest which its ancestors had in their Alaska lands, and the interest which Indian tribes with comparable habits and customs had in the lands now included in our 48 States. We will, merely for the purpose of brevity of expression, refer to the latter Indians as American Indians, and to the plaintiff and its forebears as Alaska Indians. It says, and we agree, that its ancestors had a species of ownership in the lands which they used for hunting, fishing, and berry picking. So, of course, did the American Indians. It says that, under Russian sovereignty, before the cession to the United States by the treaty of 1867, this ownership was recognized by the sovereign, and thereby given the legal status of full, complete, and exclusive ownership, to which all the normal rules of land title are applicable. We think that that asserted historical fact has not been proved. It is true that the Russians did not exploit the interior of Alaska, and admonished its traders not to disturb the peace or alienate the good will of the natives. The failure to exploit the country would seem to have been attributable to the vast area of undeveloped land of comparable climate which the Russians had in their own country and not to a legal attitude toward the natives different from the attitude of the Western European countries. Such land as the Russian Government wanted for its use or the use of its licensees it took. We think, therefore, that if such tribal *87 ¡property interest in lands, as existed under Russian -sovereignty survived the treaty of 1867, that interest under American sovereignty was substantially identical in nature with that of the American Indians. That meant that the extent to which it would be recognized and respected was completely subject to the will of the sovereign. United States v. Santa Fe Pacific Railroad Co., 314 U. S. 339. Our conclusion then is, that if the tribal interest in land of the plaintiff tribe survived the treaty, that interest was what is called, in relation to American Indians, “original Indian title” or “Indian right of occupancy,” with its weaknesses and imperfections.
As to whether tribal interests in Alaska lands survived the treaty of cession, we are in doubt, and we pass the question for the moment.
In Hynes v. Grimes Packing Co., 337 U. S. 86, Mr. Justice Reed in delivering the opinion of the Court, said, at page 106:
We have carefully considered the opinion in Miller v. United States, 159 F. 2d 997, where it is held, p. 1001, that the Indian right of occupancy of Alaska lands is compensable. With all respect to the learned judges, familiar with Alaska land laws, we cannot express agreement with that conclusion. The opinion upon which they chiefly rely, United States v. Alcea Band of Tillamooks, 329 U. S. 40, is not an authority for this position. That opinion does not hold the Indian right of occupancy compensable without specific legislative direction to make payment. See also United States v. 10.95 Acres of Land in Juneau, 75 F. Supp. 841.
The plaintiff urges, correctly, that this statement is dictum. But it is an extremely pointed expression about the Tilla-mooks decision which must at that time have been fresh in the minds of the justices. We therefore take this statement of the Supreme Court as law. That means that even if what we have decided was the “original Indian title” of the plaintiffs survived the treaty of 1867, the plaintiffs would still not have a right in the land, against the Government, unless Congress had recognized the tribe’s interest as a legal interest. The later Tillamooks decision, reported in 341U. S. 48, is also of importance in this regard.
*88 The Government insists that whatever interest the tribe may- have had in the lands during Russian sovereignty was extinguished by the treaty.
•When the United States purchased Alaska from Russia in 1867, after the sale, and the price of $7,000,000 had been tentatively agreed upon, the United States offered to add $200,000 to the price in return for the following assurance, which was then inserted in Article VI of the treaty.
The cession of territory and dominion herein made is hereby declared to be free and unencumbered by any reservations, privileges, franchises, grants, or possessions, by any associated companies, whether corporate ■or incorporate, Russian or any other, or by any parties, except merely private individual property holders; and the cession hereby made, conveys all the rights, franchises, and privileges now belonging to Russia in the said territory or dominion, and appurtenances thereto.
The treaty also contained, in its Article II, the following language:
' In the cession of territory and dominion made by the preceding article are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property.
' The meaning of the treaty provisions is not clear. The government says that these provisions warranted the title to the land in Alaska free of all encumbrances except interests of individuals. The plaintiff says that it meant much less than that; that it did not warrant against interests owned by a clan of Indians whose ownership, the plaintiff says, had always been recognized and had never been disturbed by the Russian Government or its agencies. The history of the times lends some support to the construction for which the plaintiff argues. Chairman Charles Sumner of the House Committee on Foreign Relations, in discussing the treaty, said:
Beyond the consideration founded on the desire of “strengthening the good understanding” between the two countries, there is the pecuniary consideration already 'mentioned; which underwent a change in the progress of the negotiation. The sum of seven millions *89 was originally agreed upon; but when it was understood that there was a fur company and also an ice company enjoying monopolies under the existing government, it was thought best that these should be extinguished, in' consideration of which our government added $200,000 to the purchase money, and the Eussian government in formal terms declared “the cession of territory to be free and unencumbered by any reservations, privileges, franchises, grants, or possessions, by. any associated companies, whether corporate or incorporate, or by any parties, except merely private individual property-holders.” Thus the United States receive this cession free of all incumbrances, so far at least as Eussia is in a condition to make it. The treaty proceeds to say that “the cession hereby made conveys all the rights, franchises, and privileges now belonging to Eussia in said territory or dominion and appurtenances thereto.” In' other words, Eussia conveys all that she has to convey. (House of Eepresentatives Ex. Doc. No. 177, 40th Cong. 2d Sess., pages 124,135.) .
This contemporary statement tends, as the plaintiff urges, to show that the parties intended that whatever franchises issued by the Eussian Government were outstanding were to be cancelled, but that existing interests which by the usual rules of international law would not be affected by the transfer of sovereignty did not have to be cleared off the land by the Eussians before they could complete the transfer. The latter action would have required the Eussian Government to change its land law as to Alaska, abolishing tribal or clan title of lands, which was the only kind of title there was as to practically all of Alaska.
It may, with reason, be urged that Eussia was not expected, for the consideration of $200,000 to undertake the herculean task which she, over a century of ownership, had refrained from undertaking; that the United States merely took the formal warranty from Eussia as a foundation for her own intended action of determining for herself what should, be the nature and status of Indian title in Alaska lands.
The government cites us to the case of Miller v. United States, C. A. 9, 159 F. 2d 997, in which the Court held that the'“original Indian.title” of the.Tlingit Indians in Alaska was, so far as tribes or bands were concerned, extinguished by our treaty of 1867 with Eussia. The plaintiff urges that the *90 question was inadequately briefed in the Miller case and that for that reason the Court made an erroneous decision. The government itself, in various opinions of its executives relating to this very problem, has taken the position that Alaska Indians had tribal or communal rights in lands, either as aboriginal rights which survived the treaty of 1867, or as rights created by the Acts of 1884, 1891 and 1900. In United States v. Libby, McNeil and Libby, 107 F. Supp. 697, which case arose after the decision in Miller v. United States, supra, in a District Court in the same Judicial Circuit where the Miller case arose, the government urged vigorously that the Miller decision was wrong, though it could hardly have expected the District Court to depart from the holding of its own Court of Appeals. Government counsel has now presented to the court a copy of a letter from the Attorney General advising the Secretary of the Interior that his department is defending several cases before the Indian Claims Commission and this court on the basis of the decision in the Miller case. The present position of the executive with regard to the question is thus different from its earlier position.
In view of our doubt as to the effect of the quoted provisions of the treaty of 1867 upon Indian title, and, in view of our answers to other questions, which make the resolution of this doubt unnecessary, we do not resolve it.
Questions 3 and 4 are as follows:
3. What such rights, if any, would have inured to it under the Act of May 17, 1884, 23 Stat. 24, in the area, if any, which on that date was either so used or occupied by it or was claimed by it ?
4. What such rights, if any, would have inured to it under the Act of June 6, 1900, 31 Stat. 321, 330, in the area, if any, which on that date was so used or occupied by it?
The Act of May 17,1884, 23 Stat. 24, established-a District of Alaska. The act contained this proviso:
That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress.
*91 This language would seem- to mean that the physical status quo was to be preserved, but that the question of legal rights was reserved for future determination.
Section 14 of the Act of March 3, 1891, entitled “An Act to repeal timber-culture laws * * 26 Stat. 1095, 1101, provided:
That none of the provisions of the last two preceding sections of this act shall be so construed as to warrant the sale of any lands belonging to the United States * * * to which the natives of Alaska have prior rights by virtue of actual occupation * * *.
Section 27 of the Act of June 6, 1900, “An Act making further provision for a civil government for Alaska * * said:
The Indians * * * shall not be disturbed in the possession of any lands now actually in their use or occupation, * * *.
The Joint Resolution of August 8,1947,61 Stat. 920, which Resolution authorized the Secretary of Agriculture to sell timber within the Tongass National Forest, and under which the timber sale involved in this litigation was made, said:
“Possessory rights” as used in this resolution shall mean all rights, if any should exist, which are based upon aboriginal occupancy or title, or upon section 8 of the Act of May 17, 1884 (23 Stat. 24), section 14 of the Act of March 3,1891 (26 Stat. 1095), or section 27 of the Act of June 6, 1900 (31 Stat. 321), whether claimed by native tribes, native villages, native individuals, or other persons, and which have not been confirmed by patent or court decision or included within any reservation.
Sec. 2. (a) The Secretary of Agriculture, in contracts for the sale, or in the sale, of national forest timber under the provisions of the Act.of June 4,1897 (30 Stat. 11, 35), as amended, is authorized to include timber growing on any vacant, unappropriated, and unpatented lands within the exterior boundaries of the Tongass National Forest in Alaska, notwithstanding any claim of possessory rights. All such contracts and sales heretofore made are hereby validated.
(b) The Secretary of the Interior is authorized to appraise and sell such vacant, unappropriated, and unpatented lands, notwithstanding any claim of posses- *92 sory rights, within the exterior boundaries of the Ton-gass National Forest as, in the opinion of the Secretary of the Interior and the Secretary of Agriculture, are reasonably necessary in connection with or for the processing of timber from lands within such national forest, and upon such terms and conditions as they, may impose.
(c) The purchaser shall have and exercise his rights under any patent issued or contract to sell or sale made under this section free and clear of all claims based upon possessory rights.
Seo. 3. (a) All receipts from the sale of timber or from the sale of lands under section 2 of this resolution shall be maintained in a special account in the Treasury until the rights to the land and timber are finally determined.
(b) Nothing in this resolution shall be construed as recognizing or denying the validity of any claims of possessory rights to lands or timber within the exterior boundaries of the Tongass National Forest.
This latest expression of Congress seems to take special care to leave open for decision the question of the property rights of the plaintiff and other tribes which might claim rights in the area covered by the Joint Resolution. The language of Section 1 shows that Congress was aware of all the claims and legal theories which have now been presented in this case, and that of Section 3 (b) shows that Congress expressly disclaimed any intention to take a position with regard to those claims. We cannot spell out of these four pieces of legislation any Congressional intent to recognize that the plaintiff and other tribes similarly situated own the lands here in question. All that Congress recognizes is that there is a legal dispute about the question of ownership.
Our answer to questions 3 and 4 is that there is nothing in the legislation referred to which constitutes a recognition by Congress of any legal rights in the plaintiff tribe to the lands here in question.
Question 5 is as follows:
5. In the event a decision of an affirmative nature on any of issues 2, 3, or 4, is followed by evidence indicating specific property rights on the part of plaintiff at any of those times, then would the testimony of plaintiff’s witness Paul as to recent less intensive use of the areas claimed by plaintiff constitute prima facie evidence of termination or loss of such rights ?
*93 The government urges that, even conceding that the Tee-hit-ton may have owned or had an interest in the land here in question, they have lost that interest because, for some 50 years, their numbers have been so small that they have, as we have found, been physically incapable of controlling or exploiting the area which the clan controlled and exploited in earlier times. Since 1900, the clan has consisted of 65 or fewer persons. The area claimed comprises some 352,800 acres of land.
In view of our answers to' the preceding questions, this question does not call for an answer. ■
Question 6 is as follows:
■ 6. If any such property rights are established, and had not meanwhile, been terminated or lost, then would the execution of the Timber Sale Agreement of August 20, 1951 (as admitted in paragraph 10 of defendant’s Answer), constitute a compensable taking of such rights, or would it give rise to a right to an accounting within the jurisdiction of this Court, or both ?
This question, in view of our answers to the other questions, does not call for an answer.
We answer question 1 in the affirmative. We do not answer questions 2, 5, and 6. Our answer to questions 3 and 4 is that no rights inured to the plaintiff as a result of the legislation referred to.
Prettxman, Circuit Judge, (sitting by designation); WhitakeR, Judge; Littleton, Judge; and Jones, Chief Judge, concur.,
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Tlingit and Haida are the names of native languages of southeastern Alaska, and are also commonly used as generic terms descriptive of the Indians speaking those respective languages'-. The-language-speaking .groups called Tlingit and Haida are not now and never were in- themselves landowning units.
2. Social and property , rights of Alaska . Indians- are inseparably intermingled. The Tlingit were divided so- *94 daily into phratries. Each of the two larger phratries was in turn divided into a number of clans, membership in which descended exclusively through the mother. Marriage within the clan or phratry was forbidden because of the idea of descent from a mythical ancestor. Neither the Tlingit as a whole nor any of the phratries had any political structure or formal leadership.
3. Some of the larger clans were widely scattered throughout southeastern Alaska with local clan divisions in two or more villages in different parts of that area, while other clans were wholly localized in a single community. Some of the smaller “clans” were in reality merely subdivisions of the larger ones and should actually be called “clan divisions.” The Tee-hit-ton was in reality a subdivision or offshoot of the widespread Kiksadi clan. The Tenedi of Klawock belonged to the same subclan as the Tee-hit-ton of Stikine. Both Tenedi and Tee-hit-ton are translated as “bark-house-people”; therefore it would appear that the Tee-hit-ton had at least one local clan division outside of the Stikine area. Within the Stikine area the Tee-hit-ton had local clan divisions in two or more villages.
4. In a Tlingit village there were always members of at least two phratries. Furthermore, in a village there were local divisions of two or more clans. Each local division of a clan, in turn was made up of a number of house-groups and each house-group of a number of families. The village was a loose organization of often bitterly contesting clans.
5. The local units such as the local clans or the local clan divisions were the primary political units and were autonomous.
6. The local clan or local clan division was also the primary owning group. The local clan or the local clan division claimed and exercised the right to exploit food and clothing resources in specific areas which had significance or importance to the people, such as hunting areas, salmon streams, or portions thereof, house sites in villages, and berry patches.
7. The Tee-hit-ton Indians are a clan of Tlingit Indians belonging to the Raven phratry; they associated with individuals from other clans in a common winter village of the Stikine geographical community on Wrangell Island, but *95 bad local clan divisions in two or more villages within the Stikine area. The Tee-hit-ton are ethnographically distinguishable as a group of American Indians.
8. This suit involves an alleged taking by defendant on August 20,1951, of a portion of plaintiff’s alleged proprietary interest in all that area of land and water (including in each instance the timber, fish, game, mineral and other natural resources incident thereto) in southeastern Alaska which' is bounded substantially as follows: Beginning at Point Baker, thence following the watersheds on Prince of Wales Island to Ratz Point, thence along the middle of Clarence Strait, across the northwestern portion of Etolin Island to Quiet Harbor, through the middle of Stikine Strait to Reef Point on Woronkofski Island, across the western portion of that Island to just beyond Wedge Point, thence between Yank Island and Zarembo Island around Zarembo Island and through the middle of Sumner Strait to the place of beginning, including all waters between Prince of Wales Island and Zarembo Island, and elsewhere extending to mid-channel, a distance varying from two to five miles from the shore, and comprising approximately 352,800 acres of land and 150 square miles of water. The said area is wholly within the exterior boundaries of the Tongass National Forest.
9. Russia was the only world power other than the United States that ever exercised any degree of sovereignty over any portion of what is now Alaska. Bering’s second expedition in 1741 is commonly accepted as the beginning of the Russian history of Alaska, but until 1799 there was practically no exercise of Russian authority, and competing groups of Russian traders fought with each other and exploited such natives as were within their reach.
10; In 1824 the Russian Minister of Foreign Affairs formally- advised one of the leaders of the Russian American Company that the Russian Government deliberately refrained from claiming, on the basis of the right of prior discovery, more territory than it could claim by virtue of the right of first permanent settlement.
11. The Russian American Company, originally chartered in 1799 and rechartered in 1821 and 1844, was in form a *96 commercial fur and- trading'monopoly, but in practice it also functioned as the only governmental agency ever set up in Alaska by the Russians.
12. The Aleutian Islands and the Alaska Peninsula were the only areas ever brought fully under Russian administration, and the natives of those areas were required to work for the Russian American Company. The other Indian tribes, and the Tlingit in particular, were generally considered as independent. During the Company’s first twenty years there was considerable hostility between Tlingit and Russians.
13. In the Charter of 1821, the distinction was drawn between “tribes inhabiting the places administered by the Company” and “the independent neighboring people.” Secs. 42-56 dealt at length with the former. Secs. 57-59, 68, dealing with the latter, provided in part as follows:
Sec. 57. The principal object of the Company being catching of the sea animals and wild beasts, the Com--pany has no need to spread its rule from the coast where it practices such catchings, into the interior of the country, and it should not make effort to conquer tribes inhabiting these coasts; therefore, if the Company should think it in its interest to establish posts in some localities of the American continent in order to secure its commerce, it shall do so with the consent of the aboriginal inhabitants of such localities and shall use all possible means in order to maintain a good, relationship with, them, avoiding anything which might create in these people suspicion of the intention to violate their indépendence.
Sec. 58. The Company is prohibited to ask from such tribes tributes, taxes, dues or any other kind of contributions; * * * '
14. In the Charter of 1844, substantially similar distinctions were drawn and Secs. 281-285 provided as follows:
. Sec. 281. The colonial government shall not forcibly extend the possessions of the Company in regions inhabited by tribes riot dependent on the colonial authorities.
Sec. 282. If the colonial government deems it useful to open, for the safety of its trade operations, factories, •redoubts, or sq-called single posts in some places of the *97 American, continent, it shall proceed by the consent of the natives of these places, and apply all possible means to obtain their favor, trying to avoid anything which might arouse their suspicion of any intention to violate their independence.
Seo. 288. The company shall be'prohibited from demanding from these people tributes, taxes, or donations of any kind whatever * * *
# # * * * .
Sec. 285. The relations of the colonial administration with the independent tribes shall be limited to the exchange, by mutual consent, of European wares for furs and native products.
15. Tradition has it that Russian traders visited the Stikine winter village at Wrangell more or less regularly over a period of years prior to 1867; that on their first advent they asked for and received permission to go ashore and build a storehouse; and that on their final visit they gave the key to an Indian saying that it indicated that the property now was returned to the Indians.
■ 16. Land titles were unknown among the peasants in the greater part of Russia, and were not regulated in the colonies. In an answer to an inquiry by the Secretary of State of the United States, the Russian government, under date of October 8, 1867, formally replied with respect to the aborigines (other than those of the Aleutian Islands and of certain islands to the far north) that—
* * * From all, what we said, it clearly appears, that in this region no attempts were ever made, and no necessity ever occurred to introduce any system of landownership; the country occupied by savages is too vast; they use to camp in certain fit places, generally marked by mountains, rivers, and streams, each having its name, but no fixed boundaries whatever, and their migrations are guided by wild instinct and unbounded will. All this region has neither past nor present, and it may be confidently said of the future, that it is far and impenetrable. Every attempt of civilizing that country will stumble against unconquerable obstacles: the complete absence of local topography, the wild character of the savages, and no less wild character of nature; but, above all, the rigor and inconstancy .of climate. * * * [Translation from Russian.]
*98 17. Smallpox, bard liquor, and loose living decreased both the number of Tee-hit-ton and the authority of local clan officials over individuals. At about the turn of the century the clan had only one woman of child-bearing age. Since that time the clan has had 65 or fewer people. Because of this population decrease, and changes in the economic patterns brought about by such things as the use of powerboats for fishing, the Tee-hit-ton are and have been physically incapable of controlling or exploiting the area which was once the sole support of a larger number of people, particularly because significant amounts of time must be spent gaining a livelihood today under conditions which preclude extensive use either of small fishing streams or hunting areas.
18. Alaska was ceded to the United States by the Treaty of March 30, 1867. Ratifications were exchanged June 20, 1867. The full text of the treaty is reported at 15 Stat. 539, and is incorporated in this finding by reference. The United States paid an additional $200,000 for the inclusion in the treaty of a clause stating that “The cession of territory and dominion herein made is hereby declared to be free and unencumbered by any reservations, privileges, franchises, grants, or possessions, by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties, except merely private individual property holders; * * *.”
19. Alaska remained an unorganized territory until the approval of its Organic Act of May 17, 1884, 23 Stat. 24. Section 8 of that Act provided:
* * * That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: * * *
Section 27 of the Act of June 6, 1900, 31 Stat. 321, 330, similarly provided:
The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands now actually in their use or occupation, * * *
*99 20. Congress has never enacted any procedure such as referred to in the quoted portion of the Act of May 17,1884.
21. By a Timber Sale Agreement executed August 20, 1951, and expressly stated as having been made pursuant to the Act of June 4, 1897 (30 Stat. 35), as amended, and the Act of August 8, 1947 (61 Stat. 920), defendant agreed to sell to Ketchikan Pulp & Paper Company, a Washington corporation, all merchantable timber available to June 30, 2004 (estimated at 1,500,000,000 cubic feet), on a specified portion of the area described in finding 8. The Agreement included provisions that title to all timber shall remain in the United States until it has been paid for, felled, and scaled or measured, and that under certain circumstances title to timber for which payment has been made shall revert to the United States unless removed within a specified time. A copy of the entire Agreement and of the map attached thereto, are in evidence as plaintiff’s exhibits 4 and 5, respectively, and are incorporated by reference in these findings.
Up to the present time no timber covered by the above-described Timber Sale Agreement has been cut.
CONCLUSION or LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is an identifiable group of American Indians residing within the territorial limits of Alaska within the meaning of 28 U. S. C. § 1505 [issue 1] ; that, the court being of the opinion that the plaintiff’s interest in the lands prior to the treaty of 1867 was original Indian title, which, if it survived the cession of 1867, would not be a right on which a suit against the United States could be based, does not answer the question posed in issue 2; that no property rights in the land in question enforceable by suit against the United States inured to the plaintiff by reason of the statutes cited in issues 3 and 4; that issues 5 and 6, as stated, do not call for answers, in view of the court’s answers to the other questions.