TEE-HIT-TON INDIANS *v.* UNITED STATES.

No. 43. Argued November 12, 1954.—Decided February 7, 1955.

*James Craig Peacock* argued the cause for petitioner. With him on the brief were *Martin W. Meyer, William L. Paul, Jr., John E. Skilling* and *John H. Myers.*

*Ralph A. Barney* argued the cause for the United States. With him on the brief were *Solicitor General Soboloff, Assistant Attorney General Morton* and *John C. Harrington.*

Briefs of *amici curiae* were filed on behalf of the States of Idaho, by *Robert E. Smylie,* Attorney General, and *J. Clinton Peterson,* Assistant Attorney General; New Mexico, by *Richard H. Robinson,* Attorney General, and *Fred E. Wilson,* Special Assistant Attorney General; and Utah, by *E. R. Callister,* Attorney General.

MR. JUSTICE REED delivered the opinion of the Court.

This case rests upon a claim under the Fifth Amendment by petitioner, an identifiable group of American Indians of between 60 and 70 individuals residing in Alaska, for compensation for a taking by the United States of certain timber from Alaskan lands allegedly belonging to the group.[1] The area claimed is said to contain over 350,000 acres of land and 150 square miles of water. The Tee-Hit-Tons, a clan of the Tlingit Tribe, brought this suit in the Court of Claims under 28 U. S. C. § 1505. The compensation claimed does not arise from any statutory direction to pay. Payment, if it can be compelled, must be based upon a constitutional right of the Indians to recover. This is not a case that is connected with any phase of the policy of the Congress, continued throughout our history, to extinguish Indian title through negotiation rather than by force, and to grant payments

---

[1] A partial taking is compensable. *United States* v. *Kansas City Life Ins. Co.,* 339 U. S. 799, 809; *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725, 739; *United States* v. *General Motors Corp.,* 323 U. S. 373; *United States* v. *Shoshone Tribe,* 304 U. S. 111, 118.

from the public purse to needy descendants of exploited Indians. The legislation in support of that policy has received consistent interpretation from this Court in sympathy with its compassionate purpose.[2]

Upon petitioner's motion, the Court of Claims under its Rule 38 (b) [3] directed a separate trial with respect to certain specific issues of law and any related issues of fact essential to the proper adjudication of the legal issues.[4] Only those pertinent to the nature of the petitioner's interest, if any, in the lands are here for review. Substan-

---

[2] See Indian Claims Commission Act, 60 Stat. 1049; *Worcester* v. *Georgia*, 6 Pet. 515, 582; *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 87, 89; *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 354.

[3] "Separate Trials: The Court in furtherance of convenience or to avoid prejudice may order a separate trial of any claim, counterclaim, or of any separate issues or of any number of claims, counterclaims, or issues; and may enter appropriate orders or judgments with respect to any of such issues, claims, or counterclaims that are tried separately."

[4] "1. Is the plaintiff an 'identifiable group of American Indians residing within the territorial limits of . . . Alaska' within the meaning of 28 U. S. C. § 1505?"

"2. What property rights, if any, would plaintiff, after defendant's 1867 acquisition of sovereignty over Alaska, then have had in the area, if any, which from aboriginal times it had through its members, their spouses, in-laws, and permittees used or occupied in their accustomed Indian manner for fishing, hunting, berrying, maintaining permanent or seasonal villages and other structures, or burying the dead?"

"3. What such rights, if any, would have inured to it under the Act of May 17, 1884, 23 Stat. 24, in the area, if any, which on that date was either so used or occupied by it or was claimed by it?

"4. What such rights, if any, would have inured to it under the Act of June 6, 1900, 31 Stat. 321, 330, in the area, if any, which on that date was so used or occupied by it?"

"5. In the event a decision of an affirmative nature on any of issues 2, 3, or 4, is followed by evidence indicating specific property rights on the part of plaintiff at any of those times, then would the testimony of plaintiff's witness Paul as to recent less intensive use of the

tial evidence, largely documentary, relevant to these legal issues was introduced by both parties before a Commissioner who thereupon made findings of fact. The Court of Claims adopted these findings and held that petitioner was an identifiable group of American Indians residing in Alaska; that its interest in the lands prior to purchase of Alaska by the United States in 1867 was "original Indian title" or "Indian right of occupancy." *Tee-Hit-Ton Indians* v. *United States,* 128 Ct. Cl. 82, 85, 87, 120 F. Supp. 202, 203–204, 205. It was further held that if such original Indian title survived the Treaty of 1867, 15 Stat. 539, Arts. III and VI, by which Russia conveyed Alaska to the United States, such title was not sufficient basis to maintain this suit as there had been no recognition by Congress of any legal rights in petitioner to the land in question. 128 Ct. Cl., at 92, 120 F. Supp., at 208. The court said that no rights inured to plaintiff by virtue of legislation by Congress. As a result of these conclusions, no answer was necessary to questions 2, 5 and 6. The Tee-Hit-Tons' petition was thereafter dismissed.

Because of general agreement as to the importance of the question of compensation for congressionally approved taking of lands occupied in Alaska under aboriginal Indian use and claim of ownership,[5] and the conflict concerning the effect of federal legislation protecting

areas claimed by plaintiff [Tr. 13–14, 29–30, 44–45, 96–97] constitute prima facie evidence of termination or loss of such rights?"

"6. If any such property rights are established, and had not meanwhile been terminated or lost, then would the execution of the Timber Sale Agreement of August 20, 1951 (as admitted in paragraph 10 of defendant's Answer), constitute a compensable taking of such rights, or would it give rise to a right to an accounting within the jurisdiction of this Court, or both?" 128 Ct. Cl. 82, 85, 120 F. Supp. 202, 204.

[5] See Hearings before House Committee on Agriculture on H. J. Res. 205, 80th Cong., 1st Sess.; Committee Print No. 12, House Committee on Interior and Insular Affairs, 83d Cong., 2d Sess.

Indian occupation between this decision of the Court of Claims, 128 Ct. Cl., at 90, 120 F. Supp., at 206–207, and the decision of the Court of Appeals for the Ninth Circuit in *Miller* v. *United States,* 159 F. 2d 997, 1003, we granted certiorari, 347 U. S. 1009.

The Alaskan area in which petitioner claims a compensable interest is located near and within the exterior lines of the Tongass National Forest. By Joint Resolution of August 8, 1947, 61 Stat. 920, the Secretary of Agriculture was authorized to contract for the sale of national forest timber located within this National Forest "notwithstanding any claim of possessory rights." [6] The Resolution defines "possessory rights" [7] and provides for all receipts from the sale of timber to be maintained in a special account in the Treasury until the timber and land rights are finally determined.[8] Section 3 (b) of the Resolution provides:

> "Nothing in this resolution shall be construed as recognizing or denying the validity of any claims of possessory rights to lands or timber within the exterior boundaries of the Tongass National Forest."

The Secretary of Agriculture, on August 20, 1951, pursuant to this authority contracted for sale to a private company of all merchantable timber in the area claimed by petitioner. This is the sale of timber which peti-

---

[6] 61 Stat. 921, § 2 (a).

[7] *Id.,* § 1: "That 'possessory rights' as used in this resolution shall mean all rights, if any should exist, which are based upon aboriginal occupancy or title, or upon section 8 of the Act of May 17, 1884 (23 Stat. 24), section 14 of the Act of March 3, 1891 (26 Stat. 1095), or section 27 of the Act of June 6, 1900 (31 Stat. 321), whether claimed by native tribes, native villages, native individuals, or other persons, and which have not been confirmed by patent or court decision or included within any reservation."

[8] *Id.,* § 3 (a).

tioner alleges constitutes a compensable taking by the United States of a portion of its proprietary interest in the land.

The problem presented is the nature of the petitioner's interest in the land, if any. Petitioner claims a "full proprietary ownership" of the land; or, in the alternative, at least a "recognized" right to unrestricted possession, occupation and use. Either ownership or recognized possession, petitioner asserts, is compensable. If it has a fee simple interest in the entire tract, it has an interest in the timber and its sale is a partial taking of its right to "possess, use and dispose of it." *United States* v. *General Motors Corp.,* 323 U. S. 373, 378. It is petitioner's contention that its tribal predecessors have continually claimed, occupied and used the land from time immemorial; that when Russia took Alaska, the Tlingits had a well-developed social order which included a concept of property ownership; that Russia while it possessed Alaska in no manner interfered with their claim to the land; that Congress has by subsequent acts confirmed and recognized petitioner's right to occupy the land permanently and therefore the sale of the timber off such lands constitutes a taking *pro tanto* of its asserted rights in the area.

The Government denies that petitioner has any compensable interest. It asserts that the Tee-Hit-Tons' property interest, if any, is merely that of the right to the use of the land at the Government's will; that Congress has never recognized any legal interest of petitioner in the land and therefore without such recognition no compensation is due the petitioner for any taking by the United States.

I. *Recognition.*—The question of recognition may be disposed of shortly. Where the Congress by treaty or other agreement has declared that thereafter Indians were to hold the lands permanently, compensation must be paid

for subsequent taking.[9]    The petitioner contends that Congress has sufficiently "recognized" its possessory rights in the land in question so as to make its interest compensable.    Petitioner points specifically to two statutes to sustain this contention.    The first is § 8 of the Organic Act for Alaska of May 17, 1884, 23 Stat. 24.[10]    The second is § 27 of the Act of June 6, 1900, which was to provide for a civil government for Alaska, 31 Stat. 321, 330.[11]    The Court of Appeals in the *Miller* case, *supra*, felt that these Acts constituted recognition of Indian ownership.    159 F. 2d 997, 1002–1003.

We have carefully examined these statutes and the pertinent legislative history and find nothing to indicate any intention by Congress to grant to the Indians any permanent rights in the lands of Alaska occupied by them by permission of Congress.    Rather, it clearly appears that what was intended was merely to retain the *status quo* until further congressional or judicial action was taken.[12]    There is no particular form for congressional recognition of Indian right of permanent occupancy.    It may be established in a variety of ways but there must be

---

[9] *United States* v. *Creek Nation,* 295 U. S. 103, 109–110; *Shoshone Tribe* v. *United States,* 299 U. S. 476, 497; *Chippewa Indians* v. *United States,* 301 U. S. 358, 375–376; *United States* v. *Klamath Indians,* 304 U. S. 119; *Sioux Tribe* v. *United States,* 316 U. S. 317, 326.

[10] ". . . That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: . . . ."

[11] "The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands now actually in their use or occupation, . . . ."

[12] 23 Stat. 24; see 15 Cong. Rec. 530–531; H. R. Rep. No. 476, 48th Cong., 1st Sess. 2; 31 Stat. 321; see 33 Cong. Rec. 5966.

the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation. *Hynes* v. *Grimes Packing Co.,* 337 U. S. 86, 101.

This policy of Congress toward the Alaskan Indian lands was maintained and reflected by its expression in the Joint Resolution of 1947 under which the timber contracts were made.[13]

II. *Indian Title.*—(a) The nature of aboriginal Indian interest in land and the various rights as between the Indians and the United States dependent on such interest are far from novel as concerns our Indian inhabitants. It is well settled that in all the States of the Union the tribes who inhabited the lands of the States held claim to such lands after the coming of the white man, under what is sometimes termed original Indian title or permission from the whites to occupy. That description means mere possession not specifically recognized as ownership by Congress. After conquest they were permitted to occupy portions of territory over which they had previously exercised "sovereignty," as we use that term. This is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians.

This position of the Indian has long been rationalized by the legal theory that discovery and conquest gave the conquerors sovereignty over and ownership of the lands thus obtained. 1 Wheaton's International Law, c. V. The great case of *Johnson* v. *McIntosh,* 8 Wheat. 543, denied the power of an Indian tribe to pass their

---

[13] 61 Stat. 921, § 3 (b), see p. 276, *supra;* H. R. Rep. No. 873, 80th Cong., 1st Sess.

right of occupancy to another. It confirmed the practice of two hundred years of American history "that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest." P. 587.

"We will not enter into the controversy, whether agriculturists, merchants, and manufacturers, have a right, on abstract principles, to expel hunters from the territory they possess, or to contract their limits. Conquest gives a title which the Courts of the conqueror cannot deny, whatever the private and speculative opinions of individuals may be, respecting the original justice of the claim which has been successfully asserted." P. 588.

"Frequent and bloody wars, in which the whites were not always the aggressors, unavoidably ensued. European policy, numbers, and skill, prevailed. As the white population advanced, that of the Indians necessarily receded. The country in the immediate neighbourhood of agriculturists became unfit for them. The game fled into thicker and more unbroken forests, and the Indians followed. The soil, to which the crown originally claimed title, being no longer occupied by its ancient inhabitants, was parcelled out according to the will of the sovereign power, and taken possession of by persons who claimed immediately from the crown, or mediately, through its grantees or deputies." Pp. 590–591. See *Buttz* v. *Northern Pacific R. Co.,* 119 U. S. 55, 66; *Martin* v. *Waddell,* 16 Pet. 367, 409; *Clark* v. *Smith,* 13 Pet. 195, 201.

In *Beecher* v. *Wetherby,* 95 U. S. 517, a tract of land which Indians were then expressly permitted by the United States to occupy was granted to Wisconsin. In

a controversy over timber, this Court held the Wisconsin title good.

> "The grantee, it is true, would take only the naked fee, and could not disturb the occupancy of the Indians: that occupancy could only be interfered with or determined by the United States. It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties, neither of whom derives title from the Indians. The right of the United States to dispose of the fee of lands occupied by them has always been recognized by this court from the foundation of the government." P. 525.

In 1941 a unanimous Court wrote, concerning Indian title, the following:

> "Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method and time of such extinguishment raise political, not justiciable, issues." *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 347.

No case in this Court has ever held that taking of Indian title or use by Congress required compensation. The American people have compassion for the descendants of those Indians who were deprived of their homes and hunting grounds by the drive of civilization. They seek to have the Indians share the benefits of our society as citizens of this Nation. Generous provision has been will-

ingly made to allow tribes to recover for wrongs, as a matter of grace, not because of legal liability. 60 Stat. 1050.

(b) There is one opinion in a case decided by this Court that contains language indicating that unrecognized Indian title might be compensable under the Constitution when taken by the United States. *United States* v. *Tillamooks*, 329 U. S. 40.

Recovery was allowed under a jurisdictional Act of 1935, 49 Stat. 801, that permitted payments to a few specific Indian tribes for "legal and equitable claims arising under or growing out of the original Indian title" to land, because of some unratified treaties negotiated with them and other tribes. The other tribes had already been compensated.[14] Five years later this Court unanimously held that none of the former opinions in Vol. 329 of the United States Reports expressed the view that recovery was grounded on a taking under the Fifth Amendment. *United States* v. *Tillamooks*, 341 U. S. 48. Interest, payable on recovery for a taking under the Fifth Amendment, was denied.

Before the second *Tillamook* case, a decision was made on Alaskan Tlingit lands held by original Indian title. *Miller* v. *United States*, 159 F. 2d 997. That opinion holds such a title compensable under the Fifth Amendment on reasoning drawn from the language of this Court's first *Tillamook* case.[15] After the *Miller* decision,

---

[14] 329 U. S., at p. 44.

[15] It relies also, p. 1001, on *Minnesota* v. *Hitchcock*, 185 U. S. 373, and *United States* v. *Klamath Indians*, 304 U. S. 119. These cases, however, concern Government taking of lands held under Indian title recognized by the United States as an Indian reservation. See 185 U. S., at 390, 304 U. S., at 121, 16 Stat. 707, *United States* v. *Algoma Lumber Co.*, 305 U. S. 415, 420, and 329 U. S. 40, 52, note 29. See *United States* v. *10.95 Acres of Land*, 75 F. Supp. 841.

this Court had occasion to consider the holding of that case on Indian title in *Hynes* v. *Grimes Packing Co.,* 337 U. S. 86, 106, note 28. We there commented as to the first *Tillamook* case: "That opinion does not hold the Indian right of occupancy compensable without specific legislative direction to make payment." We further declared "we cannot express agreement with that [compensability of Indian title by the *Miller* case] conclusion." [16]

Later the Government used the *Hynes* v. *Grimes Packing Co.* note in the second *Tillamook* case, petition for certiorari, p. 10, to support its argument that the first *Tillamook* opinion did not decide that taking of original Indian title was compensable under the Fifth Amendment.[17] Thereupon this Court in the second *Tillamook* case, 341 U. S. 48, held that the first case was not "grounded on a taking under the Fifth Amendment." Therefore no interest was due. This later *Tillamook*

---

[16] The statement concerning the *Miller* case was needed to meet the Grimes Packing Company argument that Congress could not have intended to authorize the Interior Department to include an important and valuable fishing area, see *Hynes* v. *Grimes Packing Co.,* 337 U. S., at 95, note 10, in a permanent reservation for an Indian population of 57 eligible voters. Actual occupation of Alaskan lands by Indians authorized the creation of a reservation. 337 U. S., at 91. One created by Congress through recognition of a permanent right in the Indians from aboriginal use would require compensation to them for reopening to the public. *Id.,* at 103–106. It was therefore important to show that there was no right arising from aboriginal occupation.

[17] Three million dollars was involved in the *Tillamook* case as the value of the land, and the interest granted by the Court of Claims was $14,000,000. The Government pointed out that if aboriginal Indian title was compensable without specific legislation to that effect, there were claims with estimated interest already pending under the Indian jurisdictional act aggregating $9,000,000,000.

decision by a unanimous Court supported the Court of Claims in its view of the law in this present case. See *Tee-Hit-Ton Indians* v. *United States,* 128 Ct. Cl., at 87, 120 F. Supp., at 204–205. We think it must be concluded that the recovery in the *Tillamook* case was based upon statutory direction to pay for the aboriginal title in the special jurisdictional act to equalize the Tillamooks with the neighboring tribes, rather than upon a holding that there had been a compensable taking under the Fifth Amendment.[18] This leaves unimpaired the rule derived

---

[18] In *Cariño* v. *Insular Government of the Philippine Islands,* 212 U. S. 449, this Court did uphold as valid a claim of land ownership in which tribal custom and tribal recognition of ownership played a part. Petitioner was an Igorot who asserted the right to register ownership of certain land although he had no document of title from the Spanish Government and no recognition of ownership had been extended by Spain or by the United States. The United States Government had taken possession of the land for a public use and disputed the fact that petitioner had any legally recognizable title.

The basis of the Court's decision, however, distinguishes it from applicability to the Tee-Hit-Ton claim. The Court relied chiefly upon the purpose of our acquisition of the Philippines as disclosed by the Organic Act of July 1, 1902, which was to administer property and rights "for the benefit of the inhabitants thereof." 32 Stat. 695. This purpose in acquisition and its effect on land held by the natives was distinguished from the settlement of the white race in the United States where "the dominant purpose of the whites in America was to occupy the land." 212 U. S., at 458. The Court further found that the Spanish law and exercise of Spanish sovereignty over the islands tended to support rather than defeat a prescriptive right. Since this was no communal claim to a vast uncultivated area, it was natural to apply the law of prescription rather than a rule of sovereign ownership or dominium. Cariño's claim was to a 370-acre farm which his grandfather had fenced some fifty years before and was used by three generations as a pasture for livestock and some cultivation of vegetables and grain. The case bears closer analogy to the ordinary prescriptive rights situation rather than to a recognition by this Court of any aboriginal use and possession amounting to fee simple ownership.

from *Johnson* v. *McIntosh* that the taking by the United States of unrecognized Indian title is not compensable under the Fifth Amendment.

This is true, not because an Indian or an Indian tribe has no standing to sue or because the United States has not consented to be sued for the taking of original Indian title, but because Indian occupation of land without government recognition of ownership creates no rights against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law.

(c) What has been heretofore set out deals largely with the Indians of the Plains and east of the Mississippi. The Tee-Hit-Tons urge, however, that their stage of civilization and their concept of ownership of property takes them out of the rule applicable to the Indians of the States. They assert that Russia never took their lands in the sense that European nations seized the rest of America. The Court of Claims, however, saw no distinction between their use of the land and that of the Indians of the Eastern United States. See *Tee-Hit-Ton Indians* v. *United States,* 128 Ct. Cl. 82, 87, 120 F. Supp. 202, 204–205. That court had no evidence that the Russian handling of the Indian land problem differed from ours. The natives were left the use of the great part of their vast hunting and fishing territory but what Russia wanted for its use and that of its licensees, it took. The court's conclusion on this issue was based on strong evidence.

In considering the character of the Tee-Hit-Tons' use of the land, the Court of Claims had before it the testimony of a single witness who was offered by plaintiff. He stated that he was the chief of the Tee-Hit-Ton tribe. He qualified as an expert on the Tlingits, a group composed of numerous interconnected tribes including the Tee-Hit-Tons. His testimony showed that the Tee-Hit-Tons had become greatly reduced in numbers. Membership de-

scends only through the female line.  At the present time there are only a few women of childbearing age and a total membership of some 65.

The witness pointed out that their claim of ownership was based on possession and use.  The use that was made of the controverted area was for the location in winter of villages in sheltered spots and in summer along fishing streams and/or bays.  The ownership was not individual but tribal.  As the witness stated, "Any member of the tribe may use any portion of the land that he wishes, and as long as he uses it that is his for his own enjoyment, and is not to be trespassed upon by anybody else, but the minute he stops using it then any other member of the tribe can come in and use that area."

When the Russians first came to the Tlingit territory, the most important of the chiefs moved the people to what is now the location of the town of Wrangell.  Each tribe took a portion of Wrangell harbor and the chief gave permission to the Russians to build a house on the shore.

The witness learned the alleged boundaries of the Tee-Hit-Ton area from hunting and fishing with his uncle after his return from Carlisle Indian School about 1904. From the knowledge so obtained, he outlined in red on the map, which petitioner filed as an exhibit, the territory claimed by the Tee-Hit-Tons.  Use by other tribal members is sketchily asserted.  This is the same 350,000 acres claimed by the petition.  On it he marked six places to show the Indians' use of the land: (1) his great uncle was buried here, (2) a town, (3) his uncle's house, (4) a town, (5) his mother's house, (6) smokehouse.  He also pointed out the uses of this tract for fishing salmon and for hunting beaver, deer and mink.

The testimony further shows that while membership in the tribe and therefore ownership in the common prop-

erty descended only through the female line, the various tribes of the Tlingits allowed one another to use their lands. Before power boats, the Indians would put their shelters for hunting and fishing away from villages. With the power boats, they used them as living quarters.

In addition to this verbal testimony, exhibits were introduced by both sides as to the land use. These exhibits are secondary authorities but they bear out the general proposition that land claims among the Tlingits, and likewise of their smaller group, the Tee-Hit-Tons, was wholly tribal. It was more a claim of sovereignty than of ownership. The articles presented to the Court of Claims by those who have studied and written of the tribal groups agree with the above testimony. There were scattered shelters and villages moved from place to place as game or fish became scarce. There was recognition of tribal rights to hunt and fish on certain general areas, with claims to that effect carved on totem poles. From all that was presented, the Court of Claims concluded, and we agree, that the Tee-Hit-Tons were in a hunting and fishing stage of civilization, with shelters fitted to their environment, and claims to rights to use identified territory for these activities as well as the gathering of wild products of the earth.[19] We think this evidence introduced by both sides confirms the Court of Claims' con-

---

[19] Krause, Die Tlinkit-Indianer (The Tlinkit Indians), pp. 93–115 and 120–122; Oberg, The Social Economy of the Tlingit Indians (a dissertation submitted to the University of Chicago, Dept. of Anthropology for the Degree of Doctor of Philosophy, Dec. 1937); Goldschmidt-Haas Report to Commissioner of Indian Affairs on Possessory Rights of the Natives of Southeastern Alaska, pp. i, ii, iv, 1–25, 31–33, 123–133, related statements numbered 65, 66, 67, 68 and 69, and chart 11; S. Doc. No. 152, 81st Cong., 2d Sess. (Russian Administration of Alaska and the Status of the Alaskan Natives); see *Johnson* v. *Pacific Coast S. S. Co.*, 2 Alaska 224.

clusion that the petitioner's use of its lands was like the use of the nomadic tribes of the States Indians.[20]

The line of cases adjudicating Indian rights on American soil leads to the conclusion that Indian occupancy, not

---

[20] It is significant that even with the Pueblo Indians of the Mexican Land Sessions, despite their centuries-old sedentary agricultural and pastoral life, the United States found it proper to confirm to them a title in their lands. The area in which the Pueblos are located came under our sovereignty by the Treaty of Guadalupe Hidalgo, 9 Stat. 922, and the Gadsden Purchase Treaty of December 30, 1853, 10 Stat. 1031. The Treaty of Guadalupe Hidalgo contained a guarantee by the United States to respect the property rights of Mexicans located within the territory acquired. Art. VIII, 9 Stat. 929. This provision was incorporated by reference into the Gadsden Treaty. Art. V, 10 Stat. 1035. The latter treaty also contained a provision that no grants of land within the ceded territory made after a certain date would be recognized or any grants "made previously [would] be respected or be considered as obligatory which have not been located and duly recorded in the archives of Mexico." Art. VI, 10 Stat. 1035. This provision was held to bar recognition of fee ownership in the Pueblo of Santa Rosa which claimed such by immemorial use and possession as well as by prescription against Spain and Mexico because they could produce no paper title to the lands. *Pueblo of Santa Rosa* v. *Fall*, 56 App. D. C. 259, 262, 12 F. 2d 332, 335, reversed on other grounds, 273 U. S. 315.

Disputes as to the Indian titles in the Pueblos and their position as wards required congressional action for settlement. See Brayer, Pueblo Indian Land Grants of the "Rio Abajo," New Mexico; Cohen, Handbook of Federal Indian Law, c. 20. These problems were put in the way of solution only by congressional recognition of the Pueblos' title to their land and the decisions of this Court as to their racial character as Indians, subject to necessary federal tutelage. 10 Stat. 308, Creation of Office of Surveyor-General of New Mexico to report area of bona fide holdings; Report of Secretary of the Interior, covering that of the Surveyor-General of New Mexico, S. Exec. Doc. No. 5, 34th Cong., 3d Sess. 174, 411; Confirmation of titles for approved Pueblo Land Claims, 11 Stat. 374; S. Doc. No. 1117, 37th Cong., 2d Sess. 581–582, Report of Secretary of Interior showing New Mexico Pueblos with confirmed titles.

Representative Sandidge, who reported the first Pueblo Confirmation Act to the House of Representatives, stated that the Pueblo

specifically recognized as ownership by action authorized by Congress, may be extinguished by the Government without compensation.[21] Every American schoolboy knows that the savage tribes of this continent were de-

claims, "although they are valid, are not held to be so by this Government, nor by any of its courts, until the claim shall have been acted on specifically. I will say, furthermore, that the whole land system of the Territory of New Mexico is held in abeyance until these private land claims shall have been acted on by Congress." Cong. Globe, 35th Cong., 1st Sess. 2090 (1858).

The position as Indians of the inhabitants of the Pueblos was considered in *United States* v. *Joseph,* 94 U. S. 614, and *United States* v. *Sandoval,* 231 U. S. 28.

For an interesting sidelight on the difficulties inherent in the problems, see Brayer, *supra,* p. 14, and *United States* v. *Ritchie,* 17 How. 525.

Thus it is seen that congressional action was deemed necessary to validate the ownership of the Pueblos whose claim was certainly founded upon stronger legal and historical basis than the Tlingits.

[21] The Departments of Interior, Agriculture and Justice agree with this conclusion. See Committee Print No. 12, Supplemental Reports dated January 11, 1954, on H. R. 1921, 83d Cong., 2d Sess.

Department of Interior: "That the Indian right of occupancy is not a property right in the accepted legal sense was clearly indicated when *United States* v. *Alcea Band of Tillamooks,* 341 U. S. 48 (1951), was reargued. The Supreme Court stated, in a per curiam decision, that the taking of lands to which Indians had a right of occupancy was not a taking within the meaning of the fifth amendment entitling the dispossessed to just compensation.

"Since possessory rights based solely upon aboriginal occupancy or use are thus of an unusual nature, subject to the whim of the sovereign owner of the land who can give good title to third parties by extinguishing such rights, they cannot be regarded as clouds upon title in the ordinary sense of the word. Therefore, we suggest the deletion, in section 3 (c) of the bill, of the words 'upon aboriginal occupancy or title, or.' " P. 3.

Department of Agriculture: "We also concur in the belief which we understand is being expressed by the Department of the Interior that no rights presently exist on the basis of aboriginal occupancy or title. We believe that this is equally true with respect to lands

prived of their ancestral ranges by force and that, even when the Indians ceded millions of acres by treaty in return for blankets, food and trinkets, it was not a sale but the conquerors' will that deprived them of their land. The duty that rests on this Nation was adequately phrased by Mr. Justice Jackson in his concurrence, MR. JUSTICE BLACK joining, in *Shoshone Indians* v. *United States,* 324 U. S. 335, at 355, a case that differentiated "recognized" from "unrecognized" Indian title, and held the former only compensable. *Id.,* at 339–340. His words will be found at 354–358. He ends thus:

> "We agree with MR. JUSTICE REED that no legal rights are today to be recognized in the Shoshones by reason of this treaty. We agree with MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY as to their moral deserts. We do not mean to leave the impression that the two have any relation to each other. The finding that the treaty creates no legal obligations does not restrict Congress from such appropriations as its judgment dictates 'for the health, education, and industrial advancement of said Indians,' which is the position in which Congress would find itself if we found that it did create legal obligations and tried to put a value on them." *Id.,* at 358.

In the light of the history of Indian relations in this Nation, no other course would meet the problem of the growth of the United States except to make congressional contributions for Indian lands rather than to subject the Government to an obligation to pay the value when taken with interest to the date of payment. Our conclusion

---

within the Tongass National Forest just as it is with respect to lands elsewhere in Alaska." P. 7.

Department of Justice: "Thus, there is no legal or equitable basis for claims or rights allegedly arising from 'aboriginal occupancy or title.'" P. 11.

does not uphold harshness as against tenderness toward the Indians, but it leaves with Congress, where it belongs, the policy of Indian gratuities for the termination of Indian occupancy of Government-owned land rather than making compensation for its value a rigid constitutional principle.

The judgment of the Court of Claims is

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE FRANKFURTER concur, dissenting.

The first Organic Act for Alaska became a law on May 17, 1884, 23 Stat. 24. It contained a provision in § 8 which reads as follows:

> "the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: *And provided further,* That parties who have located mines or mineral privileges therein under the laws of the United States applicable to the public domain, or who have occupied and improved or exercised acts of ownership over such claims, shall not be disturbed therein, but shall be allowed to perfect their title to such claims by payment as aforesaid."

Section 12 provided for a report upon "the condition of the Indians residing in said Territory, what lands, if any, should be reserved for their use, what provision shall be made for their education[,] what rights by occupation of settlers should be recognized," etc.

Respondent contends, and the Court apparently agrees, that this provision should be read, not as recognizing In-

dian title, but as reserving the question whether they have any rights in the land.

It is said that since § 8 contemplates the possible future acquisition of "title," it expressly negates any idea that the Indians have any "title." That is the argument; and that apparently is the conclusion of the Court.

There are, it seems to me, two answers to that proposition.

*First.* The first turns on the words of the Act. The general land laws of the United States were not made applicable to Alaska. § 8. No provision was made for opening up the lands to settlement, for clearing titles, for issuing patents, all as explained in Gruening, The State of Alaska (1954), p. 47 *et seq.* There were, however, at least two classes of claimants to Alaskan lands—one, the Indians; the other, those who had mining claims. Section 8 of the Act did not recognize the "title" of either. Rather, it provided that one group, the miners, should be allowed to "perfect their title"; while the others, the Indians, were to acquire "title" only as provided by future legislation. Obviously the word "title" was used in the conveyancer's sense; and § 8 did service in opening the door to perfection of "title" in the case of miners, and in deferring the perfection of "title" in the case of the Indians.

*Second.* The second proposition turns on the legislative history of § 8. Section 8 of the Act commands that the Indians "shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them." The words "or now claimed by them" were added by an amendment offered during the debates by Senator Plumb of Kansas. 15 Cong. Rec. 627–628. Senator Benjamin Harrison, in accepting the amendment, said, ". . . it was the intention of the committee to protect to the fullest extent all the rights of the Indians in Alaska and of any residents who had settled there, but

at the same time to allow the development of the mineral resources . . . ." *Id.*

Senator Plumb spoke somewhat humorously about the rights of the Indians:

> "I do not know by what tenure the Indians are there nor what ordinarily characterizes their claim of title, but it will be observed that the language of the proviso I propose to amend puts them into very small quarters. I think about 2 feet by 6 to each Indian would be the proper construction of the language 'actually in their use or occupation.' Under the general rule of occupation applied to an Indian by a white man, that would be a tolerably limited occupation and might possibly land them in the sea." *Id.*, at 530.

Senator Plumb went on to say, "I propose that the Indian shall at least have as many rights after the passage of this bill as he had before." *Id.*, at 531. Senator Harrison replied that it was the intention of the committee "to save from all possible invasion the rights of the Indian residents of Alaska." *Id.*, at 531. He gave emphasis to the point by this addition:

> "It was the object of the committee absolutely to save the rights of all occupying Indians in that Territory until the report which is provided for in another section of the bill could be made, when the Secretary of the Interior could ascertain what their claims were and could definitely define any reservations that were necessary to be set apart for their use. We did not intend to allow any invasion of the Territory by which private rights could be acquired by any person except in so far as it was necessary in order to establish title to mining claims in the Territory. Believing that that would occupy but the smallest portion of the territory here and there, isolated and detached

and small quantities of ground, we thought the reservation of lands occupied by the Indians or by anybody else was a sufficient guard against any serious invasion of their rights." *Id.*, at 531.

The conclusion seems clear that Congress in the 1884 Act recognized the claims of these Indians to their Alaskan lands. What those lands were was not known. Where they were located, what were their metes and bounds, were also unknown. Senator Plumb thought they probably were small and restricted. But all agreed that the Indians were to keep them, wherever they lay. It must be remembered that the Congress was legislating about a Territory concerning which little was known. No report was available showing the nature and extent of any claims to the land. No Indian was present to point out his tribe's domain. Therefore, Congress did the humane thing of saving to the Indians all rights claimed; it let them keep what they had prior to the new Act. The future course of action was made clear—conflicting claims would be reconciled and the Indian lands would be put into reservations.

That purpose is wholly at war with the one now attributed to the Congress of reserving for some future day the question whether the Indians were to have any rights to the land.*

---

* The reading which the Court gives the 1884 Act dispels the slight hope which Ernest Gruening, our foremost Alaskan authority, found in its provisions dealing with the Indians. In The State of Alaska (1954) 355–356, Gruening states:

"For the first seventeen years of United States rule over Alaska, the aboriginal inhabitants, who constituted an overwhelming majority of its approximately thirty thousand souls, were as devoid of attention, or even mention, as was the population as a whole. They became, by virtue of the organic act of 1884, in one respect at least, a mildly privileged, or at least a less disadvantaged, group, as compared with subsequently arriving Americans.

"For the act provided 'that the Indians or other persons . . . shall

There remains the question what kind of "title" the right of use and occupancy embraces. Some Indian rights concern fishing alone. See *Tulee* v. *Washington*, 315 U. S. 681. Others may include only hunting or grazing or other limited uses. Whether the rights recognized in 1884 embraced rights to timber, litigated here, has not been determined by the finders of fact. The case should be remanded for those findings. It is sufficient now only to determine that under the jurisdictional Act the Court of Claims is empowered to entertain the complaint by reason of the recognition afforded the Indian rights by the Act of 1884.

---

not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them.' The natives' right of occupancy was, in other words, affirmed, while all later arrivals had to await the slow evolution of the land laws for even the assurance of the right to possess land.

" 'The terms under which such persons [the Indians or other persons],' continued the act, 'may acquire title to such lands is reserved for future legislation by Congress.'

"Seventy years of future had passed by 1954 and the legislation by which the titles to Indians' lands could be acquired had not yet been enacted by Congress."