Wilfred W. GREENE, a/k/a "Chief Eagle Heart," individually as a Native Indian, and as the duly-elected Chief of the Seaconke Wampanoag Tribe, Wampanoag Nation, and the Seaconke Wampanoag Tribe, Wampanoag Nation, and on behalf of the Native bands, clans, families, entities and individuals that are the descendants and heirs of the original Native Indians described in a deed from Wamsutta (a/k/a Alexander) to Thomas Willett dated April 8, 1661, Plaintiff,

v.

The State of RHODE ISLAND, the Town of Cumberland, and the City of Woonsocket in the State of Rhode Island, individually and as representatives of a defendant class composed of all persons and entities (including each named defendant) that currently occupy or have or claim an interest in any of the lands reserved for the Natives in a deed from Wamsutta (a/k/a Alexander) to Thomas Willett dated April 8, 1661, Defendants.

C.A. No. 03–69S.

United States District Court,
D. Rhode Island.

Oct. 31, 2003.

Earl F. Pasbach, Esq., Providence, RI, for Plaintiff.

Neil F.X. Kelly, Attorney General's Office, Providence, RI, Claire J.V. Richards, Office of the Governor, Providence, RI, Thomas E. Hefner, Attorney for the Town of Cumberland, Cumberland, RI, Joseph P. Carroll, Attorney for the City of Woonsocket, Woonsocket, RI, for Defendants.

John F. Killoy, Wakefield, RI, for Narragansett Indians, Amicus Curiae.

Eric H. Miller, Kaplan & Kolb, Inc., Providence, RI, Gus P. Coldebella, Brett C. Gerry, Goodwin Procter, LLP, Boston MA, for American Land Title Association, Amicus Curiae.

## DECISION AND ORDER

SMITH, District Judge.

This case concerns a thirty-four square mile portion of land (the "Land") bordering the Blackstone River in northern

Rhode Island. Wilfred W. Greene a/k/a "Chief Eagle Heart," Chief of the Seaconke Wampanoag Indian Tribe (the "Tribe" or the "Wampanoags"), brought this action claiming that a 1661 deed from the Wampanoags to a colonist reserved use and occupation rights over the Land, which now comprises significant portions of Cumberland and Woonsocket, Rhode Island. Even though the Tribe no longer occupies the Land, the Wampanoags now seek, *inter alia,* a declaration from this Court that they are the lawful and equitable owners of the Land.

The State of Rhode Island (the "State"), the Town of Cumberland (the "Town"), and the City of Woonsocket (the "City") (collectively, the "Defendants") have filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that the Rhode Island Indian Claims Settlement Act (the "Settlement Act" or the "Act"), 25 U.S.C. § 1701 *et seq.,* bars the Wampanoags' claims. For the reasons that follow, this Court grants the Defendants' Motion to Dismiss.

## I. *Factual Background*

On a motion to dismiss, the Court takes the facts as pled by the plaintiff as true. The following facts are drawn from the Plaintiff's Complaint:

In 1621, Chief Massasoit, then Chief of the Wampanoags, entered into a treaty with Roger Williams to ensure the peaceful coexistence of the Tribe and the colonists. Complaint ¶ 19. In June of 1643, the General Court of the New Plymouth Colony created a formal procedure for the purchase of Indian lands in order to prevent confusion and controversy over land titles. Complaint ¶ 20. In 1661, Chief Wamsutta, then Chief of the Wampanoags, deeded land (including the Land that is the subject of this action) to Captain Thomas Willett ("Willett"), a colonist who had been authorized by the General Court of New Plymouth to purchase land from the Indians. This deed reserved "a competent portion of the land for some of the Natives at Mishanegitatonett[1] for to plant and sojourn upon." Complaint ¶ 21. The Plaintiff contends that this deed afforded the Wampanoags a "coexisting right" with the colonists to use the land. *Id.*

On July 15, 1663, King Charles II granted the Charter of Rhode Island and Providence Plantations (the "Charter"), which annulled all prior claims to Indian lands by right of discovery or conquest. Complaint ¶ 27. The Charter recognized the responsibility of the government to oversee the conveyance of lands from the Indians. In contrast to other colonies' charters, the Rhode Island Charter provided that the Indians had title to Indian lands and that any conveyance from the Indians must be confirmed and established by royal consent. Complaint ¶ 29.

On April 10, 1666, Willett transferred the Land to the Court of New Plymouth, which in turn created a committee empowered to sell and divide the Land. Complaint ¶ 23. As the Court of New Plymouth divided and subdivided the Land, the Wampanoags' use of the Land diminished. Complaint ¶ 25.

As the colonial expansion continued, tensions developed between the Wampanoags and the colonists. *Id.* By 1675, those tensions had escalated into what is now known as King Philip's War.[2] Complaint

---

1. The natives at Mishanegitatonett were members of the Wampanoag Nation of tribes who had occupied the land "from time immemorial." Complaint ¶ 10. The Wampanoag Nation is an Indian tribe recognized by the Commonwealth of Massachusetts, and active in Rhode Island. However, the Wampanoags are not a federally recognized Indian tribe.

2. King Philip's War was one of the bloodiest and most significant wars of the colonial peri-

¶ 26. The war displaced many of the Wampanoags living in the area that was reserved by the 1661 deed. *Id.* On October 19, 1694, the Massachusetts Bay Colony created the Town of Attleborough, which encompassed the reserved Wampanoag land known as the Attleborough Gore. Complaint ¶ 28. In 1746, King George II ceded the Attleborough Gore to the Rhode Island colony, which renamed it as the Town of Cumberland. *Id.* A portion of that land was later ceded to the Town of Woonsocket in 1867. Complaint ¶ 33.

The Wampanoags contend that they are entitled to the Land as allegedly reserved to them in the 1661 deed because the Tribe never made any treaties, deeds, or other writings that would have legitimately transferred their rights in the Land. Complaint ¶¶ 30, 37.

## II. *Standard of Review*

In deciding Defendants' Motion to Dismiss, this Court must determine whether the Complaint states any claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). The facts alleged in the Wampanoags' Complaint must be taken as true, and all reasonable inferences must be drawn in their favor. *See Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Aybar v. Crispin–Reyes*, 118 F.3d 10, 13 (1st Cir.1997); *Chongris v. Board of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir.1987). A court should not grant a motion to dismiss pursuant to Rule 12(b)(6) unless it appears to a certainty that the plaintiff would be unable to recover under any set of facts. *Roma*

*Construction Co. v. aRusso*, 96 F.3d 566, 569 (1st Cir.1996).

■ A court considering a motion to dismiss may consider public records without transforming the motion into one for summary judgment. *See Cruz v. Melecio*, 204 F.3d 14, 21–22 (1st Cir.2000); *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir.1993).

## III. *Discussion*

In their Complaint, the Wampanoags have asserted the following causes of action: (1) a federal and state Indian common law rights claim against the State, Town, and City, in which the Wampanoags assert the exclusive right to occupy the Land; (2) a civil rights claim pursuant to 42 U.S.C. § 1983 against the State, Town, and City; (3) violations of Article 1, Section 16 of the Rhode Island Constitution against the State, Town, and City; (4) violations of the Due Process Clause of the Fourteenth Amendment against the State, Town, and City; (5) a general claim asserting that the State, Town, and City lack jurisdiction over Indian Lands; and (6) a breach of fiduciary duty claim against the State. The Wampanoags also seek damages from the Defendants and each member of the "Landholder Class" (those in possession of the subject lands in or around Cumberland and Woonsocket, Rhode Island).

### A. *The Plaintiff's Land Entitlement Claims*

In 1978, Congress passed the Settlement Act in order to resolve a disagreement between the Narragansett Indian Tribe (the "Narragansetts")[3], the State of Rhode

---

od between the British government and a New England Indian tribe. At the time of the war, Metacomet, Massasoit's son, was Chief of the Wampanoags and had been friendly with the British. In an effort to honor Massa-

soit's son, the British referred to Metacomet as "Philip," after Philip of Macedon.

3. Although not at the time of the filing of their suits or the enactment of the Settlement Act, the Narragansetts, unlike the Wampanoags,

Island, and landowners in Charlestown, Rhode Island regarding the Narragansett Indian Tribe's purported entitlement to aboriginal ownership of approximately 3,200 acres of land located in Charlestown. *See* 25 U.S.C. § 1701. The Narragansetts asserted their claims to these lands by filing title claims in this court. *See Narragansett Tribe of Indians v. S.R.I. Land Dev. Corp.*, 418 F.Supp. 798 (D.R.I.1976); *Narragansett Tribe of Indians v. R.I. Dir. Of Envtl. Mgmt.*, C.A. No. 75–0005 (D.R.I.). To resolve the dispute, the Narragansetts, the State of Rhode Island, and the Town of Charlestown executed a Joint Memorandum of Understanding ("JMOU"). In exchange for the extinguishment of its title claims, the Narragansetts obtained a lump-sum payment and control over approximately 1,800 acres of land in Charlestown. *See Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 689 (1st Cir.1994). Because of Congress' plenary powers over Indian matters, in order for the JMOU to have an effect, the terms of the JMOU needed to be memorialized in a federal law. *See id.;* 25 U.S.C. § 1701(d). The Act is Congress' memorialization of the JMOU.

The Narragansetts' lawsuits had the effect of clouding title to much of the land in Charlestown. To dispel these clouds, the Settlement Act ratified all previous transfers of land and resources from "any Indian, Indian nation, or tribe of Indians" in Rhode Island. *See* 25 U.S.C. § 1712(a)(1). In approving all prior transfers of land, Congress extinguished *all* Indian land claims within Rhode Island against the United States, the State of Rhode Island, or any of its municipalities. *See* 25 U.S.C. § 1712(a)(1)-(3). The statute provides, in pertinent part, that:

[A]ny transfer of land or natural resources located anywhere within the State of Rhode Island outside the town of Charlestown from, by, or on behalf of any Indian, Indian nation, or tribe of Indians (other than transfers included in and approved by section 1705 of this title), including but not limited to a transfer pursuant to any statute of any State, shall be deemed to have been made in accordance with the Constitution and all laws of the United States that are specifically applicable to transfers of land or natural resources from, by, or on behalf of any Indian, Indian nation, or tribe of Indians (including but not limited to the Trade and Intercourse Act of 1790, Act of July 22, 1790 (ch. 33, 1 Stat. 137), and all amendments thereto and all subsequent versions thereof) and Congress does hereby approve any such transfer effective as of the date of said transfer....

25 U.S.C. § 1712(a)(1). In addition, the Act also addressed Indians' aboriginal entitlement to Rhode Island land. In pertinent part, the Act provides:

[T]o the extent that any transfer of land or natural resources ... may involve land or natural resources to which ... [an] Indian nation, or tribe of Indians had aboriginal title, [this Act] shall be regarded as an extinguishment of such aboriginal title as of the date of said transfer[.]

25 U.S.C. § 1712(a)(2). Aboriginal title is title to land that the Indians inhabited from time immemorial, which cannot be extinguished without explicit action by Congress. *See Oneida County, N.Y. v. Oneida Indian Nation of New York*, 470 U.S. 226, 234–35, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). By approving these

are a federally recognized Indian tribe. *See* Final Determination for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island, 48 Fed.Reg. 6177–05 (Feb. 2, 1983); *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 689 (1st Cir.1994).

prior transfers of land and extinguishing aboriginal title, the Act extinguished any Indian's or Indian Tribe's right to bring a claim against the United States, the State of Rhode Island or any of its municipalities regarding that land. *See* 25 U.S.C. § 1712(a)(3). The Act further prevented any Indian or Indian Tribe from seeking claims for damages for the lost use and occupancy of aboriginal land. *Id.*

■ The Defendants contend that the Settlement Act bars the land claims asserted in the Plaintiff's Complaint. In interpreting the Act, this Court must "look first and foremost to its text." *United States v. Alvarez–Sanchez,* 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) (citing *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)). The Settlement Act specified that these provisions would become final unless a claim were brought within 180 days of the passage of the Act. *See* 25 U.S.C. § 1712(b). The Tribe did not file a claim under the Settlement Act, nor did it ever formally assert its entitlement to the Land until the initiation of this action on February 27, 2003, nearly 24 years after the deadline for filing. Because the Wampanoags failed to commence an action under the Act within 180 days of its enactment, the Defendants contend that the Plaintiff's claims in this case are barred.

The Plaintiff insists that the Defendants misconstrue the nature of this action. The Wampanoags contend that the Act does not bar their claims in this case because they never actually transferred their deeded interest in the Land. In other words, the Tribe argues that the rights under which the current possessors own the Land are subject to the rights retained by the Tribe under the deed.

In order to prevail on this argument, the Wampanoags must prove that the Land

was never "transferred," as that term is defined under the Act. The Act defines "transfer" broadly to include, without limitation, "any sale, grant, lease, allotment, partition, or conveyance, . . . or any event or events that resulted in a change of possession or control of land or natural resources." 25 U.S.C. § 1702(j). This definition casts a wide net with respect to the type of land transfers Congress intended the Act to cover. The Act specifically controls "*any* transfer of land" in Rhode Island "from, by, or on behalf of *any* Indian, Indian nation, or tribe of Indians . . . ." 25 U.S.C. § 1712(a)(1) (emphasis added). The Wampanoags, as a tribe of Indians, are subject to this provision. Moreover, not only does the Act apply to formal transfers of land under its definition of "transfer," *i.e.,* by deed, but it also applies to all situations in which land transferred from one landholder to another. This is evident by looking to the Act's broad definition of transfer: "*any* event or events that resulted in a change of possession or control." 25 U.S.C. § 1702(j)(emphasis added). Since the time of the conveyance referenced in the 1661 deed, it is beyond dispute that the Land has changed hands (a multitude of times) and has been in the possession or control of individuals or entities other than the Wampanoags for over 350 years. This Court is hard-pressed to conceive of any other reason for including such broad language other than because Congress intended to preclude claims just like those asserted by the Wampanoags in this case.

Even if the Wampanoags were correct in their contention that they never "transferred" their rights under the 1661 deed, the Act would nevertheless bar their claims. The land rights that the Wampanoags held over the Land up to the 1661 deed were aboriginal in nature. In other words, the Land that the Wampanoags

deeded to Willett and the colonists in 1661 was land that the Tribe had held since "time immemorial." When the Tribe reserved its rights in a portion of the land in the deed to Willett, the Wampanoags merely reserved a portion of their aboriginal interest in the Land. The deed to Willet did not alter the aboriginal status of the Wampanoags' interest in the Land. The Wampanoags simply retained a more limited aboriginal right in the Land by deeding away its remaining land in the 1661 deed. Congress was clear in its intent to extinguish all aboriginal title to lands in Rhode Island. *See* 25 U.S.C. § 1712(a)(3). Accordingly, the Wampanoags' land claims are barred by the Act.

### B. *Civil Rights Claims Against the State, Town, and City*

The Wampanoags also allege that the Defendants' actions constituted a taking in violation of the Fifth Amendment of the United States Constitution and Article 1, Section 16 of the Rhode Island Constitution. The Plaintiff has brought these claims under 42 U.S.C. § 1983.

■ As an initial matter, the State cannot be sued under 42 U.S.C. § 1983. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."). The Plaintiff's civil rights claims against the State are therefore dismissed.

■ The Wampanoags' civil rights claims against the Town and City also fail. In *Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), an Alaskan Indian Tribe sued the United States contending that it should be compensated for the government's removal of timber from land that allegedly belonged to the tribe. In concluding that the tribe was not entitled to compensation for the loss of the timber, the Court held that aboriginal title "creates no rights against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law." 348 U.S. at 285, 75 S.Ct. 313. In this case, the Wampanoags' takings argument rests on the fact that the Act deprived them of their aboriginal title. *Tee–Hit–Ton Indians,* however, clearly held that the loss of aboriginal title is not a compensable taking under the Fifth Amendment. Accordingly, the Wampanoags' civil rights claims against the Town and City are dismissed.[4]

### C. *Due Process Violations*

■ The Tribe further alleges that the Defendants violated the Due Process Clause by failing to provide them adequate procedural due process prior to extinguishing their land rights. The Defendants, however, argue that 25 U.S.C. § 1712(b) provided the Tribe with sufficient opportunity to assert its rights to the Land, but that the Tribe failed to take advantage of that process. This Court agrees.

---

4. There are two additional grounds for dismissal. First, the Plaintiff has failed (even drawing all inferences in its favor) to allege facts indicating that the Town or City took *any* action that would amount to a taking. The Complaint merely alleges that land now comprising Woonsocket and Cumberland was ceded to Rhode Island by the English Crown. These facts alone fail to state a takings claim.

Second, the alleged misconduct on which the Wampanoags base their takings claim took place before the adoption of the Constitution. As a matter of logic, the Tribe cannot assert a federal constitutional cause of action based on misconduct that occurred before the country existed, and before the Constitution was enacted.

12

The Act's legislative history indicates that its drafters included the 180–day period for filing of claims prior to the extinguishment of Indian land claims so that a tribe with a legitimate claim could present it. "[T]he legislation is precedential in that even with respect to the hypothetical claims of Indians other than the Narragansetts, extinguishment is not effected without allowing any such Indians the *opportunity to present their claims in court.*" H.R. No. 95–1453, at 8 (1978) (emphasis added). The 180–day period in which an Indian tribe could file a land claim under the Settlement Act, while perhaps brief in comparison to other statutes of limitation, provided the Tribe with ample time to file a claim.[5] Moreover, the Act itself instructed the Tribe as to the proper procedure for contesting the extinguishment of its rights—file a claim in a court of competent jurisdiction. The Tribe never filed such a claim. Therefore, the Wampanoags' Due Process claims must be dismissed.

D. *The Wampanoags' Remaining State Law Claims*

■ To the extent that the Wampanoags' state law claims are not already barred by the Settlement Act, this Court holds that the claims are foreclosed on statute of limitations grounds. The claims in this case are based on a reservation of rights memorialized in a 1661 deed. On September 30, 1978, the Settlement Act extinguished those rights because the Wampanoags never filed a claim to the Land as required by the Act. Over twenty years later, the Wampanoags initiated this

lawsuit asserting rights to the Land. This length of time clearly exceeds Rhode Island's statute of limitations with respect to non-personal injury civil actions. *See* R.I. Gen. Laws § 9–1–13 (providing that "[e]xcept as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after."); *Levin v. Kilborn,* 756 A.2d 169, 173 (R.I.2000) (holding that breach of fiduciary duty claims are subject to a ten year statute of limitations). Therefore, the Wampanoags' state law claims are dismissed.

IV. *Conclusion*

For the foregoing reasons, the Defendants' Motion to Dismiss the Wampanoags' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is GRANTED.

IT IS SO ORDERED.

5. The Tribe contends that it was unaware of the passage of the Act and therefore would have been unable to take advantage of 25 U.S.C. § 1712(b). This Court finds the Tribe's contention difficult to take seriously. Not only is the Tribe charged with knowledge of the Act and its statute of limitations, but the Act and the State's underlying dispute with the Narragansetts was widely publicized in the press. Accordingly, this Court is hard-pressed to conclude that the Tribe did not have actual knowledge of the Act when it was enacted on September 30, 1978. At a minimum, however, the Tribe had constructive knowledge.