# United States Court of Appeals
## For the <u>First Circuit</u>

No. 03-2670

WILFRED W. GREENE, A/K/A "CHIEF EAGLE HEART", ET AL.,

Plaintiffs, Appellants,

v.

THE STATE OF RHODE ISLAND, ET AL.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. William E. Smith, <u>U.S. District Judge</u>]

---

Before

Torruella and Howard, <u>Circuit Judges</u>,
and DiClerico, Jr.,[*] <u>District Judge</u>.

---

Lesley S. Rich, with whom Earl F. Pasbach, were on brief, for appellants.
Neil F.X. Kelly, Assistant Attorney General, with whom Patrick C. Lynch, Attorney General, Claire Richards, Special Counsel, Joseph Carroll, Woonsocket City Hall, Thomas Hefner and Fogarty & Hefner, were on brief, for appellees.
Katherine J. Barton, Appellate Section, Environment & Natural Resources Division, U.S. Department of Justice, with whom Elizabeth A. Peterson, Thomas L. Sansonetti, Assistant Attorney General, and Suzanne Schaeffer, U.S. Department of the Interior, Office of the Solicitor, were on brief, for the United States.

---

February 11, 2005

---

[*] Of the District of New Hampshire, sitting by designation.

**TORRUELLA, Circuit Judge.** With this appeal, the Seaconke Wampanoag Tribe and its Chief, Wilfred W. Greene, continue their efforts to recover a portion of their ancestral lands which they claim were wrongfully taken from them by European colonists in the 17th century. Plaintiffs-appellants Wilfred W. Greene, "Chief Eagle Heart," and the Seaconke Wampanoag Tribe, Wampanoag Nation ("the Tribe" or "the Wampanoags") brought suit against defendants-appellees, the State of Rhode Island ("the State"), the Town of Cumberland, and the City of Woonsocket ("the Municipalities"), seeking a declaration that they are the lawful and equitable owners of approximately thirty-four square miles of land in Rhode Island, which they claimed was wrongfully taken from the Tribe's ancestors. The State and Municipalities moved to dismiss the case for failure to state a claim, see Fed. R. Civ. P. 12(b)(6), contending that the Tribe's claims were barred by the Rhode Island Indian Claims Settlement Act ("the Settlement Act"), 25 U.S.C. §§ 1701-1716. The district court granted the motion to dismiss, and the Tribe now appeals. We affirm the decision of the district court.

## I. Background

### A. Settlement Act

In 1978, Congress enacted the Rhode Island Indian Claims Settlement Act in order to implement the Joint Memorandum of Understanding ("the JMOU"), H.R. Rep. No. 95-1453, at 25-28 (1978), reprinted in 1978 U.S.C.C.A.N. 1948, 1962-66, that resolved two

-2-

lawsuits initiated by the Narragansett Indian Tribe ("the Narragansetts") against the State of Rhode Island and landowners in Charlestown, Rhode Island where the Narragansetts claimed aboriginal title to approximately 3200 acres of land. H.R. Rep. No. 95-1453, at 5; see also Narragansett Tribe of Indians v. S. R.I. Land Dev. Corp., 418 F. Supp. 798 (D. R.I. 1976); Narragansett Tribe of Indians v. Murphy, 426 F. Supp. 132 (D. R.I. 1976). Under the terms of the JMOU and Settlement Act, the State donated approximately 900 acres of land to the Narragansetts, and the federal government committed to provide $3.5 million to the Narragansetts for the acquisition of an additional nine hundred acres. In exchange, the State sought to dispel all clouds on land title in Rhode Island caused by Indian claims. In the Settlement Act, Congress thus ratified any prior transfer of land or natural resources located anywhere in the State of Rhode Island by the Narragansetts or any other Indian, Indian tribe, or Indian nation. 25 U.S.C. §§ 1705(a)(1), 1712(a)(1). The Settlement Act also extinguished any aboriginal title to land involved in such transfers. Id. §§ 1705(a)(2), 1712(a)(2). The Act limited challenges to the Settlement by providing that "[n]otwithstanding any other provision of law, any action to contest the constitutionality of this subchapter shall be barred unless the complaint is filed within one hundred eighty days of September 30, 1978." Id. § 1711.

## B.  Factual Background

Since the Wampanoags are appealing the district court's dismissal of their case under Federal Rule of Civil Procedure 12(b)(6), the facts alleged in the Tribe's complaint must be taken as true.  Cruz v. Melecio, 204 F.3d 14, 21 (1st Cir. 2000).  These facts are as follows:

Plaintiffs-appellants the Wampanoag Nation are an Indian tribe recognized by the Commonwealth of Massachusetts and active in Rhode Island.  The Wampanoags are not, however, a federally recognized Indian tribe.

According to the plaintiffs' complaint, in June 1643, the General Court of the New Plymouth Colony created a formal procedure for the purchase of Indian lands in order to prevent confusion and controversy over land titles.  In 1661, Chief Wamsutta of the Wampanoags deeded land to Captain Thomas Willett, a colonist who was authorized by the General Court of New Plymouth to purchase land from the Indians.  This transaction is generally known as the "North Purchase" and the deed included what is now Attleboro and North Attleboro, Massachusetts; Cumberland, Rhode Island; and part of Woonsocket, Rhode Island.  This deed reserved "a competent portion of the land for some of the Natives at Mishanegitatonett[1] for to plant and sojourn upon."  The Wampanoags contend that this

_____

[1]  The "Natives at Mishanegitatonett" were members of the Wampanoag Nation of tribes.

-4-

deed thereby afforded the Tribe a "coexisting right" with the colonists to use the land.

On July 15, 1663, King Charles II granted the Charter of Rhode Island and Providence Plantations ("the Charter"), which the Wampanoags claim annulled all prior claims to Indian lands by right of discovery or conquest. The Charter recognized the responsibility of the government to oversee the conveyance of lands from the Indians. In contrast to other colonies' charters, the Rhode Island Charter provided that the Indians had title to Indian lands and that any conveyance from the Indians must be confirmed and established by royal consent.[2]

The land that was deeded to Captain Willet in 1661 includes the land at issue here. The Wampanoags describe the subject land as thirty-four square miles in northeastern Rhode Island comprised of land from the Pawtucket River along the expanse running from Pawtucket up to Woonsocket, and moving east to what is now the border between Rhode Island and Massachusetts. This land comprises significant portions of what are now Cumberland and Woonsocket, Rhode Island.

## C.  The Current Dispute

The Wampanoags contend that they are entitled to occupy and use the land as it was reserved in the deed to Captain Willet

---

[2]  The Charter, including the provision that the Indians had title to Indian lands, was granted after the Wampanoags transferred the land in question to Captain Willet in 1661.

in 1661, because following that transfer, the Tribe never made any treaties, deeds, or other written agreements that would have legitimately transferred their rights in the land. In the district court, the Wampanoags sought a declaration that they are the lawful and equitable owners of the land in question or, in the alternative, the award of specified money damages. The State defended by moving to dismiss the case on the ground that the Wampanoags' claims are barred by the Settlement Act. In response, the Wampanoags argued that their claims do not fall within the scope of the Settlement Act and, if they did, that the Settlement Act was unconstitutional as applied to their claims. The district court rejected the Wampanoags' arguments and dismissed the case for failure to state a claim.

## II. Analysis

On appeal, the Wampanoags argue that (1) the district court erred in considering the Settlement Act as an affirmative defense in a 12(b)(6) motion to dismiss; (2) the Settlement Act does not apply to the Wampanoags' claims because their claims are based on deeded title and therefore are not claims raised by Indians qua Indians; (3) the Settlement Act does not apply to the Wampanoags' land claims because the Wampanoags never "transferred" their deeded interest in land; and (4) the Settlement Act is unconstitutional.

We review a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) <u>de novo</u>. <u>Calderón-Ortiz</u> v. <u>Laboy-Alvarado</u>, 300 F.3d 60, 62-63 (1st Cir. 2002). A complaint should not be dismissed unless it is apparent beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. <u>Conley</u> v. <u>Gibson</u>, 355 U.S. 41, 45-46 (1957). We accept as true the well-pleaded facts in the Wampanoags' complaint and indulge all reasonable inferences in the their favor. <u>Calderón-Ortiz</u>, 300 F.3d at 62-63.

## A. Conversion of motion to dismiss to summary judgment

The Wampanoag Tribe claims that the district court erred in considering the State's affirmative defense -- that the Settlement Act bars the Tribe's land claims -- without converting the motion to dismiss into one for summary judgment. Federal Rule of Civil Procedure 12(b) provides that a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted shall be converted into a Rule 56 motion for summary judgment whenever matters outside the pleading are presented to and relied on by the district court. The Tribe's complaint did not mention the Settlement Act, and the State first presented the Settlement Act to the district court in a brief supporting the State's motion to dismiss. The Wampanoags therefore assign error, claiming that the court's failure to convert the motion into one for summary judgment prevented them from introducing evidence

-7-

intended to negate the affirmative defense. We find this challenge without merit for the following reasons.

In general, courts have interpreted the Rule 12(b) conversion provision to mean that courts may consider "not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice" without converting the motion to dismiss into a motion for summary judgment. In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003). Indeed, we have specifically noted that "a court may look to matters of public record in deciding a Rule (12)(b)(6) motion without converting the motion into one for summary judgment." Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000); see also Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993). Such public records clearly include federal statutes, such as the Settlement Act at issue here. See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes.").

We have also held that, "[i]n an appropriate case, an affirmative defense may be adjudicated on a motion to dismiss for failure to state a claim." Colonial Mortgage, 324 F.3d at 16. An appropriate case is one in which two conditions are met. First, "the facts that establish the defense must be definitively

ascertainable from the allegations of the complaint . . . matters of public record, and other matters of which the court may take judicial notice." Id.; Blackstone Realty L.L.C. v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001). As we discussed above, the Settlement Act is a public record which the court may appropriately consider. Second, "the facts so gleaned must conclusively establish the affirmative defense." Colonial Mortgage, 324 F.3d at 16; see also Blackstone Realty L.L.C., 244 F.3d at 197; 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 708-32 (3d ed. 2004) (citing numerous cases considering affirmative defenses on motions to dismiss). Thus, we now proceed to consider de novo whether, based on the facts pled, the Settlement Act bars the Wampanoags' claims.

## B. Applicability of the Settlement Act

The Wampanoag Tribe claims that the Settlement Act did not extinguish their rights to the land in question because it extinguished "aboriginal title" in Rhode Island, and the Tribe argues they hold something more than aboriginal title to the disputed land. In addition, the Wampanoags argue that the Settlement Act does not apply to their claim to the land because they never transferred their rights in the disputed land.

### 1. Form of Title

The Tribe claims that the deed generated by the transaction between the predecessors to the Wampanoag Tribe and

Captain Willett in 1661 converted their interest in the disputed land from aboriginal title to either recognized title or fee simple deeded title.  As such, the Tribe argues that their claim to the disputed land has not been extinguished by the Settlement Act, which extinguished only Indian land claims by Indians qua Indians.  See H.R. Rep. No. 95-1453, at 12 ("Extinguishment of Indian land claims is limited to those claims raised by Indians qua Indians, and is not intended to affect or eliminate the claim of any Indian under any law generally applicable to Indians as well as non-Indians in Rhode Island.").  The Tribe claims that if the colonists were given a fee simple in the land then deeded to them by Willett, the Indians must also have received a fee simple estate to their Indian reservation, regardless of the nature of their prior holdings.  In the alternative, the Tribe argues that the deed should be considered a recognized "treaty" title of a reservation of land to the Indians.  Upon reviewing these arguments, we find that the deed in question does not give the Wampanoag Tribe recognized title or fee simple title to the land in question.

An Indian tribe establishes aboriginal title by showing that it has inhabited the land "from time immemorial."  Mashpee Tribe v. Secretary of the Interior, 820 F.2d 480, 481-82 (1st Cir. 1987) (quoting County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 234 (1985)).  This right does not have to be traced to a written document or land grant.  Instead, the tribe must show

"historical evidence of the tribe's long-standing physical possession" of the land.  Zuni Indian Tribe v. United States, 16 Cl. Ct. 670, 671 (1989).  The Supreme Court has defined this right not as a fee simple property right, but rather as a "right of occupancy which the sovereign [Federal Government] grants and protects against intrusion by third parties."  Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279 (1955).  This "right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians."  Id.

"Specific congressional action . . . is necessary to 'recognize' aboriginal title."  Zuni Indian Tribe, 16 Cl. Ct. at 672.  Generally recognized title to Indian lands is recognized via federal treaty or statute.  Id.  While "[t]here is no particular form for congressional recognition of Indian right of permanent occupancy," it is clear that there must be a "definite intention by congressional action or authority to accord legal rights, not merely permissive occupation."  Tee-Hit-Ton Indians, 348 U.S. at 278-79.  There is nothing to indicate any intention by Congress to grant to the Wampanoags any permanent rights in the lands of Rhode Island.  The Wampanoags are not a federally recognized tribe and the House Report at the time of the Settlement Act clearly stated that Congress did not believe there were any possible Indian claims

-11-

in Rhode Island other than those of the Narragansetts.  H.R. Rep. No. 95-1453, at 13.

In addition to recognized title as a result of direct congressional action, "[i]ndians holding recognized title to land under a foreign government may retain their title under the United States Government if such is provided for by international agreement or treaty."  Zuni Indian Tribe, 16 Cl. Ct. at 672.  There is no indication of a treaty or agreement under which the United States would have retained recognized title for the Wampanoags to lands which they do not appear to have even occupied at the time the Union was formed.  According to the Tribe's complaint, Captain Willett was authorized by the General Court of New Plymouth to negotiate the North Purchase with the Tribe's ancestors.  The area later became a part of the colony of Rhode Island pursuant to the Charter of King Charles II, dated July, 15, 1663.  "[T]he charter of the crown was considered as indispensable to [the] completion" of an Indian grant in order for it to "constitute a complete title."  Johnson v. McIntoch, 21 U.S. (8 Wheat.) 543, 603 (1823) (discussing the Rhode Island Charter granted by Charles II and the Charter's "sanction [of] a previous unauthorized purchase from Indians").[3]  The deed in question was not recorded or tendered to the Court of New Plymouth until April 10, 1666, when Captain

---

[3]  The only Indians specifically mentioned in the Charter are the Narragansett Indians.

Willett transferred the conveyance to the court. Then, in 1672, the transfer was confirmed in the first book of the records of the Rehoboth North Purchase. The book described the purchased lands, and confirmed that excepted out of this purchased land was a "Meete proportion" of lands for the use of the Indians at Sinnichiteconett (also known as Mishanegitatonett).[4] We see nothing in this history that shows a treaty or international agreement establishing recognized title for the Wampanoags by the colonial sovereign which would have been retained by the United States government upon its formation. For the above reasons, we find that the Wampanoag Tribe does not have recognized title to the disputed lands.[5]

We also fail to see any indication that the deed was ever intended to convey fee simple title to the Indians. As we

_____

[4] The "Meete" in "Meete proportion" is the old spelling for the adjective form of the word meet, which means fitting or proper.

[5] It is important to note that even if we had found that the Wampanoag Tribe has recognized title to the disputed lands, such recognition would not replace the tribe's aboriginal title, "but merely grant[] a higher, more permanent property right in addition to the historical rights derived from longstanding physical occupation and bring[] into play the 'just compensation' clause of the Fifth Amendment." Zuni Indian Tribe, 16 Cl. Ct. at 672. In other words, recognized title becomes a property right within the meaning of the Fifth Amendment, rather than a mere right of occupancy, such that its taking by the federal government would give rise to a right to just compensation.

Even with recognized title, the Wampanoags' land claims would have been extinguished by the ratification of transfers effected by section 1712(a) of the Settlement Act, 25 U.S.C. § 1712(a)(1), (3). The Wampanoags may, however, have had a valid claim for just compensation if they had brought such a claim within the 180-day limitations period required by section 1711 of the Act.

previously noted, the deed reserved "a competent portion of the land for some of the Natives at Mishanegitatonett for to plant and sojourn upon." This is the same as saying that Captain Willet took ownership to all of the land, including underlying fee title to the Indian land that was reserved so that the Wampanoags' ancestors could continue to occupy and use the land.

What the Wampanoags do have is a right that appears to fall somewhere between aboriginal title and recognized title. As we noted, recognized title is not completely separate from and a replacement of aboriginal title, but rather lends a more permanent property right to the holder of aboriginal title, resulting in a right to compensation under the Fifth Amendment if the property is taken. Zuni Indian Tribe, 16 Cl. Ct. at 672. The Wampanoag Tribe had aboriginal title to the land at the time of its negotiations with Captain Willet in 1661, based on their historical presence and use of the land. While the Tribe argues that the Charter provided them with greater title, this cannot be, because the Charter was not granted until two years after the transaction creating the deed. We agree with the district court that the deed "did not alter the aboriginal status of the Wampanoags' interest in the land." Greene v. Rhode Island, 289 F. Supp. 2d 5, 11 (D. R.I. 2003). The deed merely reserved for the Wampanoags a portion of the land over which they would continue to have aboriginal title and could continue to use as they had from time immemorial.

### 2. Whether the land was transferred

In its complaint, the Wampanoag Tribe sought, among other things, possession of the subject land, damages, disgorgement of any unjust enrichment as a result of the illegal taking of the subject lands, and a declaration that the State authorized the taking of the subject lands from the ancestors of the Tribe in violation of federal and state common law and in violation of the Indian Trade and Intercourse Act ("the Indian Nonintercourse Act"), 25 U.S.C. § 177. On appeal, the Tribe reasserts that the Settlement Act does not bar their claims to the subject land because the Tribe's right to use and occupy the land was never transferred. The State maintains that the Settlement Act extinguished the Tribe's claims because the land can be found to have been "transferred" under the Settlement Act's broad definition of a "transfer." We find that the provisions of the Settlement Act bar the Tribe's land claims.[6]

### a. Form of Title

In provisions pertinent to this dispute, the Settlement Act provides for the ratification of various transfers of land and natural resources, extinguishment of aboriginal title, and the elimination of any further Indian claims arising subsequent to the transfer to land and natural resources in Rhode Island.

---

[6] We do not find it necessary to consider issues of abandonment of the property and adverse possession here.

Specifically, the Settlement Act ratified "any transfer of land or natural resources located anywhere within the State of Rhode Island outside the town of Charlestown from, by, or on behalf of any Indian, Indian nation, or tribe of Indians" as congressionally approved as of the date of the transfer. 25 U.S.C. § 1712(a)(1). The Act also provided for ratification of any transfers of land or resources located within the town of Charlestown. Id. § 1705 (a)(1). The Settlement Act defines a "transfer" as including, but not limited to, "any sale, grant, lease, allotment, partition, or conveyance, any transaction the purpose of which was to effect a sale, grant lease, allotment, partition, or conveyance, or <u>any event or events that resulted in a change of possession or control of land or natural resources</u>." Id. § 1702(j) (emphasis added).

The Act then extinguished any Indian claims of aboriginal title to all such property as of the date of the transfer. Id. §§ 1705(a)(2), 1712(a)(2).

The Settlement Act also provided that:

> by virtue of the approval of such transfers of land or natural resources effected by this subsection or an extinguishment of aboriginal title effected thereby, <u>all claims</u> against the United States, any State or subdivision thereof, or any other person or entity, by any such Indian, Indian nation, or tribe of Indians, <u>arising subsequent to the transfer and based upon any interest in or rights involving such land or natural resources</u> (<u>including</u> but not limited to <u>claims</u> for trespass or claims <u>for use and occupancy</u>), <u>shall be regarded as extinguished</u> as of the date of the transfer.

-16-

Id. § 1712(a)(3) (emphasis added).

The Settlement Act included an exception to these provisions that section 1712 would "not apply to any claim, right, or title of any Indian, Indian nation, or tribe of Indians that is asserted in an action commenced in a court of competent jurisdiction within one hundred and eighty days" of the Settlement Act's enactment. Id. § 1712(b).

The Wampanoags contend that following the transfer of land to Captain Willett in 1661, the Tribe never "transferred" their interest in the remaining portion of land which was reserved for them in the deed. Therefore, the Wampanoags argue, the Settlement Act does not apply to their land claim. In bringing this suit, however, the Wampanoag Tribe has declared that it has been wrongfully dispossessed of these lands. The Settlement Act's broad definition of transfer includes a catchall -- "any event or events that resulted in a change of possession or control," Id. § 1702(j) -- which shows Congress's intent to include a situation such as this one, where the Wampanoags clearly had an Indian claim to the land long ago and now cease to possess the land. In addition, the Settlement Act ratified any transfer of land "from, by, or on behalf of any Indian, Indian nation, or tribe of Indians." Id. §§ 1705(a)(1), 1712(a)(1) (emphasis added). This would certainly encompass the Wampanoag Tribe of Indians. We therefore agree with the district court's conclusion that this

-17-

broad language precludes claims such as those asserted by the Wampanoags in this case.

The Settlement Act left a brief window in which claims such as the Wampanoags' could be brought. Id. § 1712(b). However, because the Wampanoags failed to bring their claims within the 180-day statute of limitation period provided for in section 1712(b), they are now barred from asserting the claims presented in this suit.

## C. Constitutional Challenges to Settlement Act

In what appears to be an attempt to avoid the preclusive effect of the statute of limitations imposed by section 1712(b) of the Settlement Act, the Wampanoag Tribe claims that the Settlement Act is unconstitutional to the extent that it extinguishes the claims of Indians, other than the Narragansett Tribe of Indians, in Rhode Island. The Tribe asserts a number of different arguments to this end. First, the Wampanoags argue that the language in the Settlement Act is not plain and unambiguous, as is required for Congress to extinguish Indian claims to aboriginal rights. Second, the Tribe suggests that the Settlement Act is impermissibly unfair and violates the United States's fiduciary duty to the Wampanoag Tribe. Third, the Tribe argues that the Settlement Act works an unconstitutional taking in violation of the Just Compensation Clause of the Fifth Amendment. Fourth, the Tribe claims that it received inadequate notice of the Settlement Act's extinguishment

-18-

of its claims, in violation of the Due Process Clause of the Fifth Amendment. Finally, the Tribe claims that the Settlement Act's provision for a 180-day statute of limitations on land claims extinguished by the Act violates due process. The federal government has intervened in this case to defend the constitutionality of the Settlement Act.

At the outset, we note that the Settlement Act barred constitutional challenges filed more than 180 days after September 30, 1978. Id. § 1711. The Wampanoags' constitutional challenges to the Settlement Act in this case are therefore nearly twenty-five years outside the statutory limitations period.

The Settlement Act's purpose is "to remove all clouds on titles resulting from . . . Indian land claims within the State of Rhode Island." See 25 U.S.C. § 1701(c). As the D.C. Circuit noted in Narragansett Indian Tribe v. National Indian Gaming Commission, "[t]his suggests that Congress intended to ensure that any suits challenging the validity of the Settlement Act were brought quickly . . . ." 158 F.3d 1335, 1339 (D.C. Cir. 1998) (comparing the Rhode Island Settlement Act to the later Alaska Native Claims Settlement Act, which contains a provision with the same language as the Rhode Island Act and adds that "[t]he purpose of this limitation on suits is to insure that, after the expiration of a reasonable period of time, the right, title, and interest of the United States, the Natives, and the State of Alaska will vest with certainty and

-19-

finality . . . ." 43 U.S.C. § 1609(a)).  In the case at hand, the Wampanoags seek to revive old land claims and unsettle land titles in direct contravention of the purpose of the Settlement Act.  Section 1711 bars the constitutional claims put forth by the Wampanoags in this suit.

The Wampanoags raise several issues in the section of their brief challenging the constitutionality of the Settlement Act which do not appear to be grounded in the Constitution.  We address these issues here.

### 1.  Plain and Unambiguous

The Wampanoag Tribe claims that the language of the Settlement Act is not plain and unambiguous and therefore cannot effect an extinguishment of Indian title.  Despite the fact that this issue is raised in the section of the Tribe's brief that is dedicated to the alleged unconstitutionality of the Settlement Act, the Tribe cites no constitutional provision to this effect, and indeed there is none.  This policy arises in statutory construction instead.

It is well established that courts will not infer congressional intent to extinguish Indian claims to aboriginal rights to land absent plain and unambiguous statutory language making such an extinguishment.  See County of Oneida, 470 U.S. at 247-48; United States v. Santa Fe Pac. R. Co., 314 U.S. 339, 346 (1941).  As these cases point out, "it has been the policy of the

federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States."  Id. at 345 (quoting Cramer v. United States, 261 U.S. 219, 227 (1923).

The language of the Act expressly declares that it applies to "any transfer of land . . . located anywhere within the State of Rhode Island outside the town of Charlestown from, by, or on behalf of any Indian, Indian nation, or tribe of Indians."  25 U.S.C. § 1712(a)(1) (emphasis added).  In addition, the House Report on the Settlement Act explained that it provided not only for "the extinguishment of all land claims of the Narragansett Tribe," but also for the "extinguishment of all land claims, if any, within the State of Rhode Island, by any other Indian tribes."  H.R. Rep. No. 95-1453, at 5 (emphasis added).  While the Wampanoags are correct that Congress thought it unlikely that there were other potential Indian land claims in Rhode Island, Congress could not have been more clear in its intent to extinguish any Indian claims to land involved in any transfer by any Indians qua Indians by this provision.

The Wampanoags incorrectly argue that Oneida requires that the location of the land to which claims are extinguished must be denominated in a plain and unambiguous fashion so that the particular disenfranchised Indians are aware that their claims are being extinguished.  The statutory language at issue in Oneida was

-21-

deemed ambiguous not because it failed to identify specific lands or Indians, but because it did not clearly express an intent to extinguish claims. <u>Oneida</u>, 470 U.S. at 247-48. In contrast, here, the Settlement Act expressly states that Congress "does hereby approve" any prior land transfers, 25 U.S.C. § 1712(a)(1); that this statutory provision "shall be regarded as an extinguishment" of any aboriginal title to land, <u>id.</u> § 1712(a)(2); and that "all claims against the United States . . . shall be regarded as extinguished as of the date of the transfer," <u>Id.</u> § 1712(a)(3).

## 2. Fiduciary Relationship

The Tribe appears to claim that the United States Congress breached a fiduciary relationship it has with the Wampanoag Tribe because Congress unfairly compensated the Narragansett Tribe in the Settlement Act without providing compensation for the extinguishment of the Indian title of "other Indians" within the State of Rhode Island. In response to this argument, the federal government claims that in the absence of federal recognition of the Wampanoag Tribe, the United States owes no them no special duty. The United States relies on <u>Miami Nation of Indians of Indiana, Inc.</u> v. <u>U.S. Dept. of the Interior</u>, 255 F.3d 342 (7th Cir. 2001), and 25 C.F.R. § 83.2, for the proposition that federal recognition of Indian groups as Indian tribes establishes a government-to-government relationship with the United States and is a prerequisite to the protection, services, and benefits of the

-22-

federal government available to Indians. Therefore, the United States claims it owes no special duty to a group of Indians where they are not recognized as a tribe by the United States or where Congress has not expressly imposed such a duty.

It is not completely accurate to say that the United States has no special duty to Indians who are not recognized as a tribe. In <u>Miami Nation of Indians</u>, 255 F.3d at 345, the Seventh Circuit referred to a number of statutes that do require federal recognition of a tribe before the Indians may partake of the statutory benefits, including the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450b(e), and the Indian Financing Act of 1974, 25 U.S.C. § 1452(c). However, we have previously found that the Indian Nonintercourse Act, 25 U.S.C. § 177, establishes a trust relationship between the United States and a tribe with respect to protection of the lands of a tribe covered by the Act, regardless of whether it is federally recognized. <u>See</u> <u>Joint Tribal Council of the Passamaquoddy Tribe</u> v. <u>Morton</u>, 528 F.2d 370, 379 (1st Cir. 1975). The Indian Nonintercourse Act expressly prohibits the conveyance of Indian lands to unauthorized third parties. 25 U.S.C. § 177. In <u>Passamaquoddy Tribe</u>, we noted that:

> Congress is not prevented from legislating as to tribes generally; and this appears to be what it has done in successive versions of the Nonintercourse Act. There is nothing in the Act to suggest that 'tribe' is to be read to

-23-

> exclude a bona fide tribe not otherwise federally recognized.

Id. at 377.

While we find that the United States does have a trust relationship with the Wampanoag Tribe pertaining to land transactions that are or may be covered by the Indian Nonintercourse Act, we do not find that the United States breached its fiduciary duty toward the tribe by failing to compensate the tribe for extinguishing any remaining aboriginal rights they may have had to land in Rhode Island. As we noted above, it is well established that aboriginal title is a mere right of occupancy, the loss of which is not a compensable taking under the Just Compensation Clause of the Fifth Amendment. See Tee-Hit-Ton Indians, 348 U.S. 281 ("No case in this Court has ever held that taking of Indian title or use by Congress required compensation."). Accordingly, the United States has not breached its fiduciary duty to the Wampanoags for failing to compensate the Tribe for the extinguishment of Indian title.

### III. Conclusion

For the reasons stated above, we affirm the district court's dismissal of the case for failure to state a claim upon which relief may be granted.

**Affirmed**.